UNITED STATES of America,
Appellee,

v.

Francis BONNET–GRULLON, also known as Francis Bowmet, also known as Francis Bonnet, also known as Francis Bowmitt, also known as Francis Grullom, also known as Francis Bowmmet, and Dwight Marlon Carter, Defendants–Appellants.

Docket Nos. 99–1321(L), 99–1325.

United States Court of Appeals,
Second Circuit.

Argued Jan. 3, 2000

Decided May 12, 2000

Matthew L. Biben, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, Jay K. Musoff, George S. Canellos, Assistant United States Attorneys, New York, New York, on the brief), for Appellee.

Edward S. Zas, New York, New York (The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, New York, on the brief), for Defendants-Appellants.

Before: FEINBERG, KEARSE, and SACK, Circuit Judges.

KEARSE, Circuit Judge:

In these consolidated appeals, defendants Francis Bonnet–Grullon and Dwight Marlon Carter appeal from judgments of conviction entered in their unrelated cases in the United States District Court for the Southern District of New York, following their respective pleas of guilty before Lewis A. Kaplan, *Judge,* to unlawfully reentering the United States after having been deported following conviction of an aggravated felony, *see* 8 U.S.C. §§ 1326(a) and (b)(2) (Supp. III 1997). Each defendant was sentenced within the Sentencing Guidelines ("Guidelines") range applicable to him, with Bonnet–Grullon receiving a term of 70 months' imprisonment, and Carter receiving a term of 46 months' imprisonment. On appeal, Bonnet–Grullon and Carter contend that the district court erred in ruling that it lacked authority to grant their requests for downward departures on the ground that the failure to depart created disparity with the far lower sentences routinely imposed for the same conduct in another judicial district. For the reasons that follow, we affirm the district court's ruling that it lacked the authority to depart on the basis of that interdistrict sentencing disparity.

## I. BACKGROUND

The pertinent facts are not in dispute in either case. Bonnet–Grullon, a citizen of the Dominican Republic, was convicted in a New York court in 1994 of criminal sale of a controlled substance in the fifth degree, an aggravated felony as defined in 8 U.S.C. § 1101(a)(43)(B) (1994). He was deported from the United States in 1995. In 1997, Bonnet–Grullon was found in the United States, having reentered without the permission of the United States Attorney General.

Carter, a citizen of Belize, was convicted in a Massachusetts court in 1993 of criminal possession of a controlled substance with intent to distribute, likewise an aggravated felony within the meaning of § 1101(a)(43)(B). Carter was deported

from the United States in 1997. He was found in the United States in 1998, having reentered without the permission of the Attorney General.

Each defendant, without entering into a plea agreement, pleaded guilty to one count of having unlawfully entered the United States following deportation for conviction of an aggravated felony, in violation of 8 U.S.C. § 1326. That section, entitled "Reentry of removed aliens," provides in pertinent part as follows:

**(a) In general**

*Subject to subsection (b) of this section,* any alien who—

> (1) has been ... deported[ ] or removed ... and thereafter
>
> (2) enters, attempts to enter, or is at any time found in, the United States, unless ... prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission ... ,

shall be fined under title 18, or *imprisoned not more than 2 years,* or both.

**(b) Criminal penalties for reentry of certain removed aliens**

*Notwithstanding subsection (a) of this section,* in the case of *any alien described in such subsection—*

> .　　.　　.　　.　　.
>
> (2) *whose removal was subsequent to a conviction for commission of an aggravated felony,* such alien *shall be* fined under such title, *imprisoned not more than 20 years,* or both. ...

8 U.S.C. §§ 1326(a) and (b)(2) (emphases added). Bonnet–Grullon and Carter moved for downward departures to reduce the substantial prison terms to which they were exposed under § 1326(b)(2).

**A.** *The Proceedings as to Bonnet–Grullon*

The presentence report ("PSR") prepared on Bonnet–Grullon concluded that,

in light of his criminal history category and his total offense level, the Guidelines range of imprisonment applicable to him was 70 to 87 months. Bonnet–Grullon did not contest the PSR computations, but he moved for a downward departure pursuant to Guidelines § 5K2.0, contending that a departure was necessary in order to avoid imposing on him a sentence that was harsher than the sentences routinely imposed on similarly situated illegally reentering aliens in certain other judicial districts.

Bonnet–Grullon pointed out that the United States Attorney's Office in the Southern District of California had adopted a policy ("SDC Policy") pursuant to which aliens who reenter the United States without permission after having been deported following their convictions for aggravated felonies, and who agree to plead guilty to the charges against them, are charged not under 8 U.S.C. § 1326 but rather under 8 U.S.C. § 1325(a) (1994). The latter section applies to any alien who enters the United States at an improper time or place or by willful concealment or misrepresentation of a material fact; it applies to such an alien whether or not he has previously been deported or convicted of an aggravated felony; and it provides a maximum prison term of six months for a first offense (a misdemeanor) and two years for a subsequent offense (a felony). Bonnet–Grullon argued that under the SDC Policy, "[d]efendants prosecuted in San Diego ... are permitted to plead guilty to two counts (one felony count and one misdemeanor count) of violating 8 U.S.C. § 1325," and thereby face a total maximum prison term of 30 months. (Letter from Legal Aid Society Attorneys John P. Curley and Edward S. Zas to Judge Kaplan dated March 8, 1999, at 1 ("Bonnet–Grullon Letter").) Bonnet–Grullon argued that

> [h]ere in this District, in contrast, similarly situated illegal re-entrants are routinely prosecuted for the more serious crime of violating 8 U.S.C.

§ 1326(b)(2). They are not permitted to plead to a lesser count. Violating § 1326(b)(2) carries a statutory maximum penalty of 20 years in prison and a typical guideline range of 70 to 87 months, with variations depending on the defendant's criminal history and other variables.

In short, illegal re-entrants prosecuted in this District systematically receive sentences far in excess of those received by defendants prosecuted elsewhere, even though the conduct and the defendants' backgrounds are essentially identical.

(Bonnet–Grullon Letter at 2.)

Bonnet–Grullon argued that the existence of the SDC policy required a downward departure in his case because the "unwarranted sentencing disparity resulting from the government's uneven charging decisions creates a 'mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" (*Id.* at 1 (quoting 18 U.S.C. § 3553(b)); *see id.* at 8 (failure to depart "would lead to a disparate sentence in a manner not contemplated by the Sentencing Commission").) He argued, *inter alia,* that this Court's decision in *United States v. Tejeda,* 146 F.3d 84 (2d Cir.1998) (per curiam), while holding that a sentencing court has no authority to depart to avoid a disparity between the sentences of codefendants, had suggested that a departure would be permissible in a case such as Bonnet–Grullon's, as *Tejeda* referred to Congress's objective of "*'eliminating disparity on a national level'*" (Bonnet–Grullon Letter at 4 (quoting *United States v. Tejeda,* 146 F.3d at 87) (emphasis in letter)).

The government, although opposing Bonnet–Grullon's motion, generally agreed with his characterization of the SDC Policy. It noted that in the mid–1990s, prior to the decision of the Supreme Court in *Almendarez–Torres v. United States,* 523

U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the Southern District of California had sought to expedite prosecution of defendants accused of illegal reentry by employing what might be described as a bifurcated–1326 policy. It offered most such defendants the opportunity, on certain conditions, to plead guilty only to a charge under subsection (a) of § 1326, on the theory that subsection (a), with its two-year maximum prison term, and subsection (b)(2), with a 20–year maximum, created separate crimes. In *Almendarez–Torres,* however, the Supreme Court held that subsection (b)(2) of § 1326 does not create a separate crime but is merely a penalty provision that may be applicable to a defendant whose conduct is described in § 1326(a). *See* 523 U.S. at 235, 118 S.Ct. 1219. Thus, as the government noted, insofar as the prior practice in the Southern District of California was concerned, the Supreme Court's ruling in *Almendarez–Torres* "eliminated the guaranty of a two-year statutory maximum sentence for an early plea to violating section 1326(a)." (Letter from Assistant United States Attorney Jay K. Musoff to Judge Kaplan dated April 5, 1999 ("Government Letter"), at 3 n. 1 (internal quotation marks omitted).) As a result, the U.S. Attorney's Office in the Southern District of California abandoned its bifurcated–1326 policy; instead, it offered illegally returning aliens who had no history of serious violence the opportunity to plead guilty to two counts under 8 U.S.C. § 1325(a), which limits imprisonment to 2½ years, rather than under § 1326:

> The first [§ 1325(a)] count is a six-month misdemeanor and the second is a two year felony. Thus, the combined cap is 30 months, a six-month increase in sentence over the now-unavailable 1326(a) plea.

(Government Letter at 3 n. 1 (internal quotation marks omitted).)

The government contended, however, that Bonnet–Grullon's motion should be denied because differing circumstances in

different judicial districts may warrant different charging practices. It argued that prosecutors have broad discretion as to "'what, if any, charges to bring against a criminal suspect'" and that the exercise of that "'*discretion is an integral feature of the criminal justice system, and is appropriate, so long as it is not based upon improper factors.*'" (Government Letter at 5 (quoting *United States v. LaBonte*, 520 U.S. 751, 762, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997)) (emphasis in letter).) Further, the government noted that the Guidelines state as a matter of policy that a sentencing "'court may accept an agreement calling for dismissal of charges or an agreement not to pursue potential charges if the remaining charges reflect the seriousness of the actual offense behavior,'" but that that policy statement explicitly warns that "'*[t]his requirement does not authorize judges to intrude upon the charging discretion of the prosecutor.*'" (Government Letter at 9 (quoting Guidelines § 6B1.2 (Policy Statement) Commentary (emphasis in letter)).) The government argued that the Guidelines thus displayed full awareness and consideration of the discretion inherent in prosecutors' charging power. The government noted also that this Court had concluded in *Valtsakis v. Commissioner of Internal Revenue*, 801 F.2d 622, 624 (2d Cir.1986) (per curiam), that differences in prosecutorial policies in different geographical areas generally do not implicate equal protection concerns unless those differences are irrational. The government argued that the disparity challenged by Bonnet–Grullon was both rational and justified.

In an opinion dated May 25, 1999, reported at 53 F.Supp.2d 430, the district court, though expressing concern for purely fortuitous sentencing disparities resulting solely from the "accident of the judicial district in which the defendant happens to be arrested," 53 F.Supp.2d at 435, denied Bonnet–Grullon's motion for a departure. The court noted that a divided panel of the Ninth Circuit, which includes California,

had ruled that a departure would be permissible to avoid disparities between defendants sentenced to no more than two years' imprisonment in the Southern District of California pursuant to the (by-then-superseded) bifurcated–1326 policy, and defendants sentenced more severely under § 1326, as written, in the contiguous Central District of California. *See United States v. Banuelos–Rodriguez*, 173 F.3d 741, 744 (9th Cir.) ("*Banuelos–Rodriguez*") (Guidelines did "not take into account the fact that sentencing disparity for § 1326 violations might occur among federal districts because of different plea-bargaining practices of U.S. Attorneys"), *vacated pending reh'g en banc*, 195 F.3d 454 (9th Cir.1999). In rejecting Bonnet–Grullon's motion, however, the district court concluded that this Court would reject the holding of the *Banuelos–Rodriguez* majority and adopt the dissenter's position that a departure is not warranted where the defendant's "offense conduct falls squarely within the heartland" of the relevant guideline, *Banuelos–Rodriguez*, 173 F.3d at 747 (Wexler, D.J., dissenting).

In arriving at that conclusion, the district court referred in particular to this Court's decision in *United States v. Stanley*, 928 F.2d 575 (2d Cir.), *cert. denied*, 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991), which held that sentencing disparities created by a prosecutor's noninvidious plea-agreement practices provided no legitimate basis for a departure. The district court reasoned that

> [t]he Circuit's fundamental point in *Stanley* was that no departure was permissible because the Sentencing Commission considered the fact that plea bargaining practices result in sentencing disparities, but elected to make no substantial changes in the practice in favor of a more cautious and incremental approach. The Commission, broadly stated, decided to accept the sentencing disparities that come from the traditional exercise of prosecutorial discretion.

53 F.Supp.2d at 435 (footnote omitted). The district court concluded as follows:

> The goal of the Sentencing Reform Act, as defendant argues, was to eliminate unwarranted sentencing disparities. This case illustrates the fact that the regime that it enacted is an imperfect means to that end—it is difficult to imagine a sentencing disparity less warranted than one which depends upon the accident of the judicial district in which the defendant happens to be arrested.... Nevertheless, in view of this Court's inability to distinguish *Stanley* on any principled basis, it holds that the sentencing disparity that results from the different charge bargaining practices employed in the Southern Districts of California and New York, respectively, does not permit this Court to depart downward under the Sentencing Guidelines. Accordingly, defendant's motion for a downward departure is denied.

*Id.* at 435–36 (footnote omitted).

Judgment was entered sentencing Bonnet–Grullon principally to 70 months' imprisonment, the bottom of the Guidelines range applicable to him.

### B. *The Proceedings as to Carter*

The PSR prepared on Carter concluded that the Guidelines range of imprisonment applicable to him was 46 to 57 months. Carter, represented by the same counsel as Bonnet–Grullon, likewise did not contest the PSR calculations. He moved for a downward departure on various grounds, including the ground of interdistrict sentencing disparity resulting from the SDC Policy. The district court denied a departure, rejecting the latter ground for the reasons stated in its opinion in Bonnet–Grullon's case. Judgment was entered sentencing Carter principally to 46 months' imprisonment.

## II. DISCUSSION

On these appeals, Bonnet–Grullon and Carter contend that the district court erred in concluding that it had no authority to depart in order to avoid disparity with the lower sentences imposed in the Southern District of California. *See generally United States v. Richardson*, 923 F.2d 13, 15 (2d Cir.1991) (refusal to depart based on district court's view that it lacks the authority to depart, is appealable). Although conceding that this Court in *United States v. Stanley*, 928 F.2d 575, held that sentencing disparities resulting from non-invidious plea-bargaining practices are not a permissible basis for departure, defendants contend that *Stanley* was implicitly overruled by *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). They argue that the disparity in question here, resulting from the SDC Policy of charging under a statutory section that has a 30–month ceiling on imprisonment, prevents the proper application of the Guidelines to illegally reentering previously-deported-aggravated felons prosecuted in the Southern District of California; that the disparity is unjustified and is of a kind or to a degree not adequately contemplated by the United States Sentencing Commission ("Commission" or "Sentencing Commission"); and that it should be remedied by a departure in favor of Bonnet–Grullon and Carter. For the reasons that follow, we reject their contentions.

### A. *The Sentencing Reform Act and the Guidelines*

Enactment of the Sentencing Reform Act of 1984 (or "Act"), 18 U.S.C. § 3551 *et seq.* and 28 U.S.C. §§ 991–998, was prompted by perceptions that broad judicial discretion in sentencing had resulted in "[f]ederal judges met[ing] out an unjustifiably wide range of sentences to offenders with similar histories, convicted of similar crimes, committed under similar circumstances." S.Rep. No. 98–225, at 38 (1984), U.S. Code Cong. & Admin. News at 3182, 3221. The Act created the Sentencing Commission and charged it with developing a comprehensive set of sentencing guidelines, *see* 28 U.S.C. § 994, designed to reduce "unwarranted sentenc-

ing disparities among defendants with similar records who have been found guilty of similar criminal conduct," *id.* § 991(b)(1)(B), consistent with "the purposes of sentencing as set forth in [18 U.S.C.] section 3553(a)(2)," 28 U.S.C. § 991(b)(1)(A); *see also id.* § 994(g). The § 3553(a)(2) "purposes of sentencing" are

> the need for the sentence imposed—
>
> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> **(B)** to afford adequate deterrence to criminal conduct;
>
> **(C)** to protect the public from further crimes of the defendant; and
>
> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Pursuant to its mandate under the Act, the Commission promulgated the Guidelines, which "specify an appropriate [sentencing range] for each class of convicted persons determined by coordinating the offense behavior categories with the offender characteristic categories" based on various factors related to the offense and the offender. Guidelines Ch. 1, pt. A, subpt. 2. "A district judge now must impose on a defendant a sentence falling within the range of the applicable Guideline, *if the case is an ordinary one.*" *Koon,* 518 U.S. at 92, 116 S.Ct. 2035 (emphasis added).

**B.** *Departures from the Guidelines— General Principles*

■ For cases out of the ordinary, the Sentencing Reform Act authorizes

> individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices.

28 U.S.C. § 991(b)(1)(B). Thus, the sentencing court may depart from the applicable Guideline range if

> the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission · in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b). In determining whether a circumstance was adequately taken into consideration by the Commission, the court must "consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." *Id.* Where a policy statement promulgated by the Commission prohibits the district court from taking a specified action, the policy statement is an authoritative guide to the meaning of the applicable guideline. *See Williams v. United States,* 503 U.S. 193, 201, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992).

In its Introduction to the Guidelines, the Commission noted the statutory constrictions on departures and stated that it

> intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

Guidelines Ch. 1, pt. A, subpt. 4(b). While identifying certain Guidelines sections that specify "several factors that the court cannot take into account as grounds for departure," including race, gender, national origin, creed, religion, and socioeconomic status, the Commission stated that, with the exceptions specified, "the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure *in an unusual case.*" *Id.* (emphasis added).

Section 5K2.0 of the Guidelines, under which Bonnet–Grullon and Carter moved, states that departures are permitted where there is " 'an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission.' " Guidelines § 5K2.0 (quoting 18 U.S.C. § 3553(b)). This policy statement reiterates a theme found in the statute and in the Guidelines' Introduction, to wit, that departures may be granted where the guideline level attached to a given factor is inadequate "in light of unusual circumstances," or where a "characteristic or circumstance is present to an unusual degree and distinguishes the case from the 'heartland' cases covered by the guidelines." Guidelines § 5K2.0 (Policy Statement). The official commentary accompanying § 5K2.0 makes explicit what is implicit, namely that in stating that departures may be granted in unusual cases, the Commission meant that they should not be granted if the case is not unusual. The comment states, *inter alia*, that "[i]n the absence of a characteristic or circumstance that distinguishes a case as sufficiently atypical to warrant a sentence different from that called for under the guidelines, a sentence outside the guideline range is not authorized," and it concludes with the warning that

> dissatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range.

*Id.* Commentary.

In *Koon,* the Supreme Court framed the departure inquiry as follows:

> [A] sentencing court considering a departure should ask the following questions:
>
> 1) *What features of this case,* potentially, *take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?*

> 2) Has the Commission forbidden departures based on those features?
>
> 3) If not, has the Commission encouraged departures based on those features?
>
> 4) If not, has the Commission discouraged departures based on those features? . . . .
>
> . . . . If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. . . . If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, . . . decide whether it is sufficient to take the case out of the Guideline's heartland. *The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be "highly infrequent."* 1995 USSG ch. 1, pt. A, p. 6.

*Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035 (internal quotation marks omitted) (emphases added). "A district court must impose a sentence within the applicable Guideline range, if it finds the case to be a typical one." *Id.* at 85, 116 S.Ct. 2035. The *Koon* Court concluded that

> a federal court's examination of whether a factor can ever be an appropriate basis for departure is limited to determining whether the Commission has proscribed, as a categorical matter, consideration of the factor. If the answer to the question is no—as it will be most of the time—the sentencing court must determine whether the factor, as occurring in

the particular circumstances, takes the case outside the heartland of the applicable Guideline.

*Id.* at 109, 116 S.Ct. 2035.

The determination of whether a case is within the heartland of the applicable guideline cannot be a matter of generalization. Rather, that determination requires a comparison of the particular facts of the case against the class of cases typically within that guideline.

For example, it does not advance the analysis much to determine that a victim's misconduct might justify a departure in some aggravated assault cases. What the district court must determine is whether the misconduct that occurred *in the particular instance* suffices to make the case *atypical.* The answer is apt to vary depending on, for instance, the severity of the misconduct, its timing, and the disruption it causes. *These considerations are factual matters.*

*Id.* at 100, 116 S.Ct. 2035 (emphases added); *see id.* at 99–100, 116 S.Ct. 2035 ("The relevant question ... is ... whether the particular factor is within the heartland given all the facts of the case."); *id.* at 98, 116 S.Ct. 2035 ("[t]o resolve this question, the district court must make a refined assessment of the many facts" of the case at hand in "comparison with the facts of other Guidelines cases," using its "day-to-day experience in criminal sentencing" to determine whether the factor in the case at hand "is present in some unusual or exceptional way").

One of the *Koon* Court's principal concerns was the standard of review to be applied to departures granted by the district court. Embracing the standards adopted in *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (appropriateness of sanctions under Fed.R.Civ.P. 11), and *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (appropriateness of attorney's fee award against the government under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)), the *Koon*

Court concluded that because "a district court's departure decision involves the consideration of unique factors that are little susceptible ... of useful generalization," 518 U.S. at 99, 116 S.Ct. 2035 (internal quotation marks omitted), and because "[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do," *id.* at 98, 116 S.Ct. 2035, the decision of a sentencing court to depart is reviewable under an abuse-of-discretion standard, *see id.* at 100, 116 S.Ct. 2035. "The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* The question of "whether a factor is a permissible basis for departure under any circumstances is a question of law," and a "district court by definition abuses its discretion when it makes an error of law." *Id.; see also Cooter & Gell v. Hartmarx Corp.,* 496 U.S. at 405, 110 S.Ct. 2447. "[T]he court of appeals need not defer to the district court's resolution of the point." *Koon,* 518 U.S. at 100, 116 S.Ct. 2035.

Applying this standard of review in *Koon,* which involved convictions of police officers for civil rights violations, to wit, the use of excessive force during an arrest, the Supreme Court considered rulings of the court of appeals reversing several departures granted by the district court, including the ground that the defendants would likely be barred from working in the field of law enforcement. The Supreme Court held that the court of appeals had erred in ruling that loss of occupation in general was an impermissible ground for departure as a matter of law; but the Supreme Court

nonetheless conclude[d] that the District Court abused its discretion by considering petitioners' career loss because the factor, *as it exists in these circumstances,* cannot take the suit out of the heartland of 1992 USSG § 2H1.4....
[O]ffenses [under 18 U.S.C. § 242] ...

involve willful violations of rights under color of law. Although cognizant of the deference owed to the district court, we must conclude *it is not unusual* for a public official who is convicted of using his governmental authority to violate a person's rights to lose his or her job and to be barred from future work in that field.

*Koon,* 518 U.S. at 110, 116 S.Ct. 2035 (emphases added).

### C. *Prosecutorial Discretion in Charging and Plea Bargaining*

■ It is well established that the decision as to what federal charges to bring against any given suspect is within the province of the Executive Branch of the government.

The Attorney General and United States Attorneys retain " 'broad discretion' " to enforce the Nation's criminal laws. *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (quoting *United States v. Goodwin,* 457 U.S. 368, 380, n. 11, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982)). They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3; see 28 U.S.C. §§ 516, 547. As a result, "[t]he presumption of regularity supports" their prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926).

*United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).

This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *see also id.* at 607–08, 105 S.Ct. 1524 (judicial supervision of prosecutorial decisions would entail a variety of systemic costs potentially hampering law enforcement).

■ Prosecutorial discretion is, of course, "subject to constitutional constraints," *United States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification," *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *see also Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). But "[i]n the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision *whether or not to prosecute,* and *what charge to file or bring before a grand jury,* generally rests entirely in his discretion.' " *Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480 (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (emphasis ours)). "[W]hen an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *Batchelder,* 442 U.S. at 123–24, 99 S.Ct. 2198.

Prosecutorial discretion in the decision as to which charges to bring and which to forgo, resting on assessments of the factors discussed in *Wayte, e.g.,* the government's priorities and overall enforcement plan, is also integral to the plea-bargaining process.

[T]he guilty plea and the often concomitant plea bargain are important components of this country's criminal justice

system. Properly administered, they can benefit all concerned. The defendant avoids extended pretrial incarceration and the anxieties and uncertainties of a trial; he gains a speedy disposition of his case, the chance to acknowledge his guilt, and a prompt start in realizing whatever potential there may be for rehabilitation. Judges and prosecutors conserve vital and scarce resources. The public is protected from the risks posed by those charged with criminal offenses who are at large on bail while awaiting completion of criminal proceedings.

*Blackledge v. Allison,* 431 U.S. 63, 71, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

### D. *Plea Bargaining and the Guidelines*

At the outset of the Guidelines, the Commission made clear that it had focused directly on the effects of prosecutorial discretion and plea bargaining on sentencing and departures from the Guidelines. In Chapter 1, Part A, Subpart 4, entitled *"The Guidelines' Resolution of Major Issues* (Policy Statement)," the first three sections are (a) *"Real Offense vs. Charge Offense Sentencing,"* (b) *"Departures,"* and (c) *"Plea Agreements."*

Recognizing the role of prosecutorial discretion, the Commission stated that one of the most fundamental questions with which it had grappled was whether to base prescribed sentences on

the actual conduct in which the defendant engaged regardless of the charges for which he was indicted or convicted ("real offense" sentencing), or upon the conduct that constitutes the elements of the offense for which the defendant was charged and of which he was convicted ("charge offense" sentencing).

Guidelines Ch. 1, pt. A, subpt. 4(a). Finding a "pure real offense" system unduly complex and hence unworkable, the "Commission moved closer to a charge offense system." *Id.* Although noting that a major drawback of a charge-offense system is the prosecutor's ability to manipulate the number of counts in an indictment, the Commission dealt with that possibility principally by including "rules for the treatment of multicount convictions with an eye toward eliminating unfair treatment that might flow from count manipulation," Guidelines Ch. 1, pt. A, subpt. 4(a); *see also id.* subpt. 4(e) ("The guidelines have been written in order to minimize the possibility that an arbitrary casting of a single transaction into several counts will produce a longer sentence."); Guidelines Ch. 3, pt. D Introductory Commentary ("In order to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct, this Part provides rules for grouping offenses together."). In addition, the Commission stated that "the sentencing court may control any inappropriate manipulation of the indictment through use of its departure power." Guidelines Ch. 1, pt. A, subpt. 4(a).

The Commission further recognized that in the great majority of cases, the Guidelines would be applied in prosecutions resolved by guilty pleas, for the Guidelines were designed to "apply to more than 90 percent of all felony and Class A misdemeanor cases," Guidelines Ch. 1, pt. A, subpt. 5, and "[n]early ninety percent of all federal criminal cases involve guilty pleas," *id.* subpt. 4(c). As to the interaction between the Guidelines and the plea-bargaining process, which in many cases ends in "some form of plea agreement," *id.,* the Commission noted that

[s]ome commentators on early Commission guideline drafts urged the Commission not to attempt any major reforms of the plea agreement process on the grounds that any set of guidelines that threatened to change pre-guidelines practice radically also threatened to make the federal system unmanageable. Others argued that guidelines that failed to control and limit plea agreements would leave untouched a "loophole" large enough to undo the good that sentencing guidelines would bring.

*The Commission decided not to make major changes in plea agreement practices in the initial guidelines, but rather to provide guidance by issuing general policy statements concerning the acceptance of plea agreements in Chapter Six, Part B (Plea Agreements).* ... [I]f the policy statements relating to plea agreements are followed, circumvention of the Sentencing Reform Act and the guidelines should not occur,

Guidelines Ch. 1, pt. A, subpt. 4(c) (emphasis added).

The Chapter Six policy statements are intended to ensure that plea negotiation practices promote the § 3553 purposes of sentencing and "do not perpetuate unwarranted sentencing disparity." Guidelines Ch. 6, pt. B Introductory Commentary. The policy statement governing the courts' acceptance of plea agreements states that

In the case of a plea agreement that includes the dismissal of any charges or an agreement not to pursue potential charges [Rule 11(e)(1)(A)], the court may accept the agreement if the court determines, for reasons stated on the record, that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines.

*Provided,* that a plea agreement that includes the dismissal of a charge or a plea agreement not to pursue a potential charge shall not preclude the conduct underlying such charge from being considered under the provisions of § 1B1.3 (Relevant Conduct) in connection with the count(s) of which the defendant is convicted.

Guidelines § 6B1.2(a) (Policy Statement) (brackets and emphasis in original). Directly addressing plea agreements affected by the exercise of prosecutorial discretion, the commentary following this guideline states, in pertinent part, as follows:

The court may accept an agreement calling for dismissal of charges or an agreement not to pursue potential charges *if* the remaining charges reflect the seriousness of the actual offense behavior. *This **requirement** does not authorize judges to intrude upon the charging discretion of the prosecutor.*

Guidelines § 6B1.2 Commentary (emphases added).

This Court discussed these policy statements in reviewing the departure granted by the district court in *United States v. Stanley,* 928 F.2d 575. There, the defendant had been indicted on a count of narcotics trafficking that would have exposed him to a prison term of up to 40 years; the government offered him a plea agreement pursuant to which he would plead guilty to a narcotics charge for which the maximum prison term was 20 years. The defendant was informed that if he did not accept but chose instead to proceed to trial, a superseding indictment would be filed against him reiterating the more severe narcotics count and adding a charge of using a firearm in connection with narcotics trafficking, in violation of 18 U.S.C. § 924(c), which would expose him to an additional, consecutive, prison term. *See* 928 F.2d at 578–79. The defendant chose to go to trial, was reindicted as threatened, and was convicted on both counts. The district court granted a downward departure from the Guidelines range on the ground that the government's routine use of the threat of a § 924(c) charge " 'as a chip in plea bargaining' " created an unwarranted disparity between those defendants who pleaded guilty and those who exercised their rights to go to trial. *Id.* at 579.

We reversed the departure, noting that the prosecutor has discretion as to what charges to bring, and reasoning that "[u]nless we c[ould] conclude that Congress did not intend to require additional punishment for conviction under § 924(c) when that charge was used as a threat in plea-bargaining, ... we [could not] conclude that the downward departure rectified a

'disparity' that was 'unwarranted.'" *United States v. Stanley,* 928 F.2d at 582. We saw no indication of such congressional intent. We also noted the Commission's express recognition that the overwhelming majority of cases are disposed of by way of plea, along with its disavowal of an intent "to 'make major changes in plea agreement practices,'" *id.* (quoting Guidelines Ch. 1, pt. A, subpt. (4)(c)), and its cautionary note that a court's power to determine whether a plea agreement adequately reflects the seriousness of the offense "'does not authorize judges to intrude upon the charging discretion of the prosecutor,'" 928 F.2d at 582 (quoting Guidelines § 6B1.2 Commentary). We concluded that where the sole rationale for the departure from the Guidelines was that "defendants who engaged in similar conduct but agreed to plead guilty to lesser charges received less punishment," 928 F.2d at 582–83, a departure is not warranted:

> No ground for departure pertaining specifically to this individual defendant, his conduct or his offense was identified.... We are left, then, with no remaining basis for departure except the judge's disapproval of the manner in which the United States Attorney for the Eastern District of New York generally exercises his discretion in negotiating plea agreements in narcotics cases involving use of a firearm. We do not believe that substituting the judge's view of the proper general prosecutorial policy for that of the prosecutor constitutes a valid ground for departure from the guideline range.

*Id.* at 583.

E. *Statutory & Guidelines Provisions Governing Reentering Aliens*

As set out in Part I above, 8 U.S.C. § 1326 prohibits an alien's reentry into the United States without permission from the Attorney General if the alien was previously deported from the United States. Such reentry by a previously-deported-aggravated felon is punishable by up to 20 years' imprisonment. *See* 8 U.S.C. §§ 1326(a) and (b)(2); *Almendarez–Torres,* 523 U.S. at 226, 118 S.Ct. 1219.

Prior to 1988, § 1326 provided that any alien who had been arrested and deported (or excluded and deported) and thereafter entered the United States without having obtained the requisite permission was to be "punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both." 8 U.S.C. § 1326 (1982). At that time, the section drew no distinctions among returning aliens in terms of their criminal history. In 1987, several bills were introduced in Congress for the purpose of "strengthen[ing] U.S. immigration law against illegal alien felons." 133 Cong. Rec. 8772 (Apr. 9, 1987) (Senate). Authors of the bills pointed out that in 1986, more than 100,000 illegal aliens had been arrested for criminal offenses, and that in Florida, New York, and California, the arrests of aliens accounted for a significant percentage of all arrests, especially in the area of narcotics trafficking. *See id.* at 8771–72; *id.* at 28840–41 (Oct. 22, 1987) (House of Representatives). For example, "[i]n southern California, the GAO report[ed] that 12–16 percent of persons arrested were aliens, 25 percent of all thefts were alien suspects, and 50–80 percent of persons arrested selling crack cocaine were illegal aliens." *Id.* at 8771. The "growing problem of felonious aliens," *id.* at 28841, was "complicating and frustrating an already overburdened legal and penal system," *id.* at 8771. Among the proposals that were adopted were amendments to § 1326 to increase from two years the maximum prison terms that could be imposed on illegally returning aliens who had previously been convicted of felonies and had been deported.

Accordingly, effective November 18, 1988, § 1326 was amended by placing the then-existing provision in a subsection lettered "(a)" and making that subsection "[s]ubject to subsection (b)," 8 U.S.C. § 1326(a) (1988). Subsection (b) was added, substantially increasing the penalties

for unlawfully reentering aliens who had been deported after having been convicted of a felony: such an alien whose predeportation conviction was for a felony "other than an aggravated felony" was subjected to imprisonment for up to five years, *id.* § 1326(b)(1) (1988); and one whose predeportation conviction was for commission of an aggravated felony was subjected to imprisonment for up to 15 years, *id.* § 1326(b)(2) (1988). In 1994, § 1326(b)(2) was further amended to increase the maximum prison term for an alien whose predeportation conviction was for commission of an aggravated felony from 15 years to the current 20 years. *See* 8 U.S.C. § 1326(b)(2) (1994).

The Guidelines currently set a base offense level of eight for a defendant convicted of violating § 1326, *see* Guidelines § 2L1.2(a), and further provide, in pertinent part, that

> [i]f the defendant previously was deported after a criminal conviction, ... increase as follows ...:

> (A) If the conviction was for an aggravated felony, increase by 16 levels,

*id.* § 2L1.2(b)(1)(A). In the original version of the Guidelines, which became effective in November 1987, when § 1326 still provided for no more than a two-year prison term, § 2L1.2 provided simply that a defendant convicted of violating § 1326 was to have a base offense level of six if he was a first offender, or eight if he was a repeat offender. Following Congress's 1988 enactment of § 1326(b), increasing the pertinent maximum prison term from two to 15 years, the Guidelines were amended to require a four-step increase in offense level for a defendant who had previously been deported after having been convicted of a felony other than an immigration law violation. *See* Guidelines App. C, amend. 193 (Nov. 1, 1989) (amending Guidelines § 2L1.2(b)). At that time, no guideline dealt expressly with a defendant whose deportation followed conviction of an aggravated felony. Instead, the 1989 amendments added an Application Note

stating that "[i]n the case of a defendant previously deported after sustaining a conviction for an aggravated felony ..., an upward departure may be warranted." *Id.;* Guidelines § 2L1.2 Application Note 3 (1989).

Effective November 1, 1991, however, § 2L1.2 and its commentary were amended again so as to provide dramatically increased punishment for a reentering previously-deported-aggravated felon, and to make that increase mandatory, rather than leaving it to the district court's departure discretion. That part of the prior Application Note 3 to § 2L1.2 which had stated that this circumstance "may" warrant an upward departure was deleted, *see* Guidelines App. C, amend. 375 (Nov. 1, 1991) (amending Guidelines § 2L1.2(b) & Application Note 3), and a new subsection (b)(2) was inserted that provided:

> If the defendant previously was deported after a conviction for an aggravated felony, increase [his offense level] by 16 levels,

Guidelines § 2L1.2(b)(2) (1991). The Commission explained that although "[p]reviously, such cases were addressed by a recommendation for consideration of an upward departure," the standardized 16–step increase was now mandatory because "[t]he Commission has determined that th[is] increased offense level[ is] appropriate to reflect the serious nature of th[is] offense[ ]." Guidelines App. C, amend. 375 (Nov. 1, 1991). Though the format of § 2L1.2(b) has changed since 1991, the mandatory 16–step increase in offense level remains in effect.

### F. *The Present Case*

Given this landscape of congressional goals, prosecutorial discretion, prevalence of guilty pleas, and Sentencing Commission cognizance of the interplay among these factors, along with the history of Guidelines § 2L1.2 itself, we reject the claims of Bonnet–Grullon and Carter, who are charged with violating § 1326, that the district court had authority to

grant them departures on the ground that the SDC Policy allows most illegally reentering previously-deported-aggravated felons prosecuted in the Southern District of California to plead guilty to § 1325(a) charges, which carry a lower maximum prison term. Preliminarily, we note our disagreement with defendants' contention that *Koon* overruled our holding in *United States v. Stanley* that a permissible exercise of prosecutorial discretion as to what charges are to be lodged cannot be a basis for departure. *Koon* was neither a case involving plea bargaining nor one involving a prosecutor's choice of what charges to pursue; nor was it a case in which departures were granted in order to address disparities with sentences imposed in other cases. *Koon* is material here principally because it framed the proper inquiry into the permissibility of a given departure, and we consider the present case within that framework.

In the *Koon* analysis, the first question is "What features *of this case*, potentially, take it outside the Guidelines' 'heartland' and make of it a *special*, or *unusual*, case?" and the second is "Has the Commission forbidden departures based *on those features?*" *Koon*, 518 U.S. at 95, 116 S.Ct. 2035 (emphases added). The departure requests of Bonnet–Grullon and Carter founder on even the first of these questions, given the "factual nature of the departure inquiry," *id.* at 99, 116 S.Ct. 2035, in which the court must determine whether the is "a characteristic or circumstance that distinguishes [their] case as .... atypical," Guidelines § 5K2.0 Commentary. The cases of Bonnet–Grullon and Carter are in no way special or unusual; neither has shown that any features "of [ ]his case" makes him an appropriate candidate for departure. Each was convicted of a narcotics offense, which is an aggravated felony; each was then deported from the United States; and each thereafter reentered the United States without the permission of the Attorney General. Neither defendant has pointed to anything to show that his acts or his personal circumstances were in any way atypical of defendants charged under 8 U.S.C. § 1326.

Instead, Bonnet–Grullon and Carter argue that the factor entitling them to departure is the prosecutorial practice in the Southern District of California of declining to charge most illegally reentering previously-deported-aggravated felons under § 1326. While Bonnet–Grullon and Carter concede that "[a]pproximately one-half of all undocumented aliens apprehended in the United States each year are caught in the Southern District of California," and that the SDC Policy, "routinely permit[ting] illegal re-entrants to plead guilty to [§ 1325(a),] a charge that carries a maximum prison sentence of 30 months," was adopted in order to permit the prosecutors in that district "[t]o handle this volume of cases" (Defendants' brief on appeal at 3), they argue that the SDC Policy undermines the Sentencing Reform Act's "central goal of sentencing uniformity" and creates a "mischief" that the court in the Southern District of New York should have power to remedy (*id.* at 2–3). In support of their position, they argue, *inter alia*, that "a court may accept a plea agreement only 'if the court determines ... that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines'" (Defendants' brief on appeal at 21 (quoting Guidelines § 6B1.2(a))), and that " 'a sentencing court may control any inappropriate manipulation of the indictment through use of its departure power'" (Defendants' brief on appeal at 21–22 (quoting Guidelines Ch. 1, pt. A, subpt. 4(a))). For several reasons, these arguments fall of their own weight.

First, as discussed above, the departure inquiry must focus on the facts of the case in which the departure is sought. The unusual factor on which Bonnet–Grullon and Carter rely, however, is the plea-bargaining practice in the Southern District of California. Plea-bargaining practices used in other cases in other judicial districts

cannot be deemed "features of *this* case," *Koon*, 518 U.S. at 95, 116 S.Ct. 2035 (internal quotation marks omitted) (emphasis added).

Second, even if we assumed that regional variations in prosecution policy could take a case outside the guideline heartland, we conclude, as we did in *United States v. Stanley*, that the answer to "whether the Commission has proscribed, as a categorical matter, consideration of the factor," *Koon*, 518 U.S. at 109, 116 S.Ct. 2035, is affirmative. We find this conclusion compelled by the content and evolution of the guideline that is expressly applicable to Bonnet–Grullon and Carter, by the structure and theory of the Guidelines as a whole, and by the Commission's policy statements with respect to plea agreements and the proper judicial deference to be accorded to matters of prosecutorial discretion.

To begin with, several of the Commission's policy statements and comments give express recognition to the fundamental premise that prosecutors have broad discretion as to which charges to bring and which to omit. As discussed in Part II.D. above, the Commission, after considerable debate, opted for a guidelines approach that moved closer to charge-offense sentencing; it recognized that, as a result, there would be variations in convictions based on variations in the exercise of prosecutorial discretion as to what charges to include; and it fashioned guidelines authorizing various types of adjustments precisely to account for prosecutorial exercises of discretion in lodging multiple counts or omitting charges. Thus, where a prosecutor exercises discretion to prosecute certain types of conduct in multiple counts, the Guidelines require the grouping of those counts in order to reduce the defendant's offense level; on the other hand, where the prosecutor exercises discretion to omit a potential charge, the Guidelines require the court to take into account uncharged conduct that is "[r]elevant [c]onduct," in order to increase the defendant's

offense level, Guidelines § 1B1.3; *id.* § 6B1.2(a) (Policy Statement). In stating, in addition, that "a sentencing court may control any *inappropriate* manipulation of the indictment through use of its departure power," *id.* Ch. 1, pt. A, subpt. 4(a) (emphasis added), the Commission implicitly denied authorization for the court to depart where charging decisions are not inappropriate. And while noting generally that there could be a departure "in an unusual case," the Commission anticipated that departures would be "highly infrequent." *Id.* Ch. 1, pt. A, subpt. 4(b).

Plainly, the Commission also envisioned that the individual guidelines it fashioned would be applied most often in prosecutions resolved by guilty pleas, given its recognition that some 90 percent of all cases are concluded in that manner and its anticipation that the Guidelines would cover more than 90 percent of all felony and Class A misdemeanor cases. And after considering the debate as to how the Guidelines should deal with plea bargaining, the Commission "decided not to make major changes in plea agreement practices," electing instead to issue "general policy statements ... in Chapter Six" as to whether or not particular types of plea agreements should be accepted. Guidelines Ch. 1, pt. A, subpt. 4(c).

The Chapter Six policy statements make clear that sentences in cases resolved by plea agreements in which prosecutors elect to forgo potential charges are to be calculated by application of the prescribed guidelines and not by departures. By stating that where a plea agreement obligates the government to forgo a potential charge "[t]he court may accept" the agreement "if the remaining charges reflect the seriousness of the actual offense behavior," and referring to that precondition as a "requirement," Guidelines § 6B1.2 Commentary, the Commission indicated that if the court believes the remaining charges do not reflect the seriousness of the defendant's conduct, the court is required to reject the plea agreement. The stated

requirement, together with the statement that "[t]his requirement does not authorize judges to intrude upon the charging discretion of the prosecutor," *id.*, persuades us that the Commission has denied authorization for the court to depart upward to compensate for what the court regards as undue prosecutorial lenience in the very case before it. That denial surely leaves no room for a departure downward to match lenience—whether due or undue— in an unrelated case.

Finally, with respect to the authority of a court to depart in order to impose a lenient sentence on a defendant charged with violating § 1326 in particular, the 1991 amendment to Guidelines § 2L1.2 is especially telling. As discussed in Part II.E. above, the 1989 version of the guideline expressly left the matter of whether a reentering aggravated felon was to be punished more severely than a non-aggravated-felon entirely to the sentencing court's discretion. In 1991, the Commission withdrew the discretion previously conferred. In adding the current provision that makes the 16–step increase in offense level for § 1326 defendants who are previously-deported-aggravated felons mandatory, and pointedly deleting the commentary that had committed the matter of increased punishment for these defendants to the sentencing court's departure discretion, the Commission explained that it was making the increase mandatory in order to reflect the seriousness of the offense. We regard the Commission's explicit removal of the matter from the sentencing court's discretion as an implicit denial of authority for the court to depart downward in order to match the sentences of other aliens prosecuted for other statutory offenses of which previously-deported-aggravated felon-status is not an element.

In sum, there is no question that Bonnet–Grullon and Carter engaged in conduct described in § 1326(a), that they are previously-deported-aggravated felons as described in § 1326(b), that they are squarely within the heartland of cases to which Guidelines § 2L1.2 applies, and that that guideline makes increased punishment of such aliens mandatory. As discussed in Part II.B. above, § 5K2.0, under which Bonnet–Grullon and Carter sought their departures, expressly does "not authorize[ ]" a departure "[i]n the absence of a characteristic or circumstance that distinguishes a case as sufficiently atypical to warrant a sentence different from that called for under the guidelines," Guidelines § 5K2.0 Commentary. Any judicial "dissatisfaction" with the fact that other defendants in other districts are charged under other statutory provisions with lower maximum prison terms, and thereby receive lower sentences, provides no basis for departure. *Id.*

■ In any event, even if we were persuaded that a departure such as that sought by Bonnet–Grullon and Carter is not categorically excluded by the terms of §§ 2L1.2 and 5K2.0, by the structure and theory of the Guidelines as a whole, and by the policy statements stating that the courts' sentencing decisions are not to intrude on discretionary prosecutorial charging decisions except as the Guidelines provide, we could not conclude that the departure sought here would be permissible. Although defendants quote the Guidelines Introduction statement that " 'a sentencing court may control any inappropriate manipulation of the indictment through use of its departure power' " (Defendants' brief on appeal at 21–22 (quoting Guidelines Ch. 1, pt. A, subpt. 4(a))), that provision is inapposite. There is no showing of any manipulation whatever in the prosecutions of Bonnet–Grullon and Carter. As defendants point out, the sentencing disparity between themselves on the one hand, and those prosecuted pursuant to the SDC Policy on the other, is the result of the charging practice employed in the Southern District of California; that is the factor labeled by Bonnet–Grullon and Carter as the "mischief." (Defendants' brief on appeal at 3.) Even assuming that the Commission meant the term

"inappropriate manipulation" to encompass a charging practice such as the SDC Policy, the SDC Policy could not be "control[led]" by a departure granted in another district. If, as defendants contend, the SDC Policy "'undermine[s] the statutory purposes of sentencing or the sentencing guidelines'" (Defendants' brief on appeal at 21), a remedy should be fashioned with respect to the allegedly mischievous SDC Policy. It would hardly be appropriate to condone departures that would make "mischief" more widespread.

We express no view as to whether the SDC Policy is indeed inappropriate under the Sentencing Reform Act or the Guidelines. As discussed in Part II.E. above, Congress at least as early as 1987 had noted the "growing problem of felonious aliens," 1987 Cong. Rec. at 28841, which taxed an "already overburdened legal and penal system," *id.* at 8771, and had highlighted southern California as one of the most severely affected areas, *see id.* By 1994, according to the then-United States Attorney for the Southern District of California, the only federal jail in the district had a capacity of 607 but "routinely housed 1200 or more," of whom 72 percent were aliens. A. Bersin, *Reinventing Immigration Law Enforcement in the Southern District of California,* 8 Fed. Sent. R. 254, 254 (1996). "Approximately one-half of all undocumented aliens apprehended in the United States each year are caught in the Southern District of California" (Defendants' brief on appeal at 3), and defendants acknowledge that the SDC Policy was adopted in order to handle that huge volume of cases. It is hardly clear that the Sentencing Reform Act, despite its principal focus on reducing unwarranted sentencing disparities, meant to foreclose the adoption of prosecutorial charging policies designed to cope with such a caseload, for the Act itself instructed the Commission, in formulating guidelines, to take care to "minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons, as determined by the Commission," 28 U.S.C. § 994(g).

Thus, although plainly there is adventitious disparity in the sentences imposed on illegally entering previously-deported-aggravated felons, depending on whether they are prosecuted under § 1325(a) or § 1326, the question of whether the SDC Policy undermines either the Act or the Guidelines, as defendants contend, is open to debate. We make no effort to resolve that question. We note only that if the policy is not inappropriate, the resulting disparity between illegally reentering previously-deported-aggravated felons charged under § 1325(a) in the Southern District of California and those charged under § 1326 in other districts where conditions are different, may be deemed a disparity that is not "unwarranted."

Finally, we note that acceptance of these defendants' contention that the district court has authority to grant departures because of the SDC Policy would lead to one of two results, both inappropriate. First, if, as seems likely, some judges exercised their discretion in favor of departing and others did not, there would still be disparity, without any relevant difference in conduct or circumstance between the group of defendants who received departures and the group who did not. And since a discretionary refusal to grant a departure is not reviewable on appeal, *see, e.g., United States. v. Chabot,* 70 F.3d 259, 260 (2d Cir.1995) (per curiam); *United States v. Adeniyi,* 912 F.2d 615, 618 (2d Cir.1990), that disparity would be uncorrectable. Alternatively, if all district judges were to grant departures in order to match the effects of the SDC Policy, departures would become the rule, rather than the exception, and few § 1326 defendants would be punished with the severity expressly intended by Congress.

### CONCLUSION

In sum, the Guidelines, which state that departures should be reserved for atypical cases and should be rare, provide express methods for dealing with prosecutorial

choices that artificially inflate or deflate the charges against a given defendant; a Guidelines policy statement expressly denies the courts authority to intrude on the exercise of prosecutorial charging discretion in plea bargaining; and the discretion that § 2L1.2 previously expressly conferred on the court, as to whether a § 1326 defendant whose prior felony was an aggravated felony should be given a longer sentence than should one whose prior felony was nonaggravated, has been withdrawn. Defendants' own conduct is squarely within the scope of § 1326, under which they were charged, and their circumstances are squarely within the heartland of cases governed by Guidelines § 2L1.2.

We conclude that the district court correctly ruled that it lacked the authority to grant downward departures solely in order to match lower sentences imposed in the Southern District of California as a result of the exercise of prosecutorial discretion in that district to bring charges under § 1325(a) instead of § 1326. We have considered all of defendants' contentions on these appeals and have found them to be without merit. The judgments are affirmed.