# United States Court of Appeals
## For the First Circuit

No. 04-1914

UNITED STATES OF AMERICA,

Appellee,

v.

GERALDO MARTÍN MELÉNDEZ-TORRES,
a/k/a GERALD MELÉNDEZ,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

---

Before

Torruella, Lynch and Howard,
Circuit Judges.

---

Marvin H. Glazier, with whom Vafiades, Brountas & Kominsky, were on brief, for appellant.
Margaret D. McGaughey, Assistant United States Attorney, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

---

August 25, 2005

---

**TORRUELLA**, **Circuit Judge**. Defendant-appellant Gerardo Martín Meléndez-Torres appeals his conviction and sentence, following a bench trial, for re-entering the United States after deportation due to a manslaughter conviction, in violation of 8 U.S.C. § 1326(a). Specifically, Meléndez challenges (1) the sufficiency of the evidence for his conviction, (2) the district court's refusal to grant a downward departure from the Sentencing Guidelines based on his "cultural assimilation" into American society, and (3) the absence of a "fast track" program in the District of Maine to process immigration cases. After careful review, we affirm.

**I**

On August 18, 1998, Meléndez -- a Mexican citizen who had lived in the United States from the age of three and who claims a Maine residency -- was ordered deported due to a 1997 manslaughter conviction in Florida. He was flown to Laredo, Texas to consummate the deportation process on January 11, 2001, but was subsequently found in Bucksport, Maine more than a year later, on May 30, 2002.

On June 12, 2003, Meléndez submitted to a bench trial, having waived his right to a jury trial, for the one-count indictment of re-entering the United States after being deported subsequent to an aggravated felony. The parties stipulated, and the court accepted, that Meléndez was an "alien" under 8 U.S.C. § 1326(a)(2), that he was convicted of manslaughter in Florida,

that he was on board a Justice Prisoner Alien Transportation System (JPATS) flight that arrived in Laredo, Texas on January 11, 2001, and that he was found in Bucksport, Maine on May 30, 2002.

During the trial, John Remsen, a special agent of the Bureau of Immigration and Customs Enforcement, testified that Meléndez's "A file" -- which records every contact an alien has with the immigration service -- included a Form I-205 warrant of removal and deportation reflecting Meléndez's deportation.  The file also contained a Form I-170, a deportation case checklist, showing that a Form I-294 -- which gives the reasons for the deportation and the number of years an alien must wait before returning to the country legally -- had been given to Meléndez, although such form could not found.  Remsen also testified that Meléndez never applied for, nor received, permission to re-enter the United States.

The next testimony came from Frances González, a Detention Enforcement Officer with the Department of Homeland Security, Immigration Customs Enforcement (formerly the Immigration and Naturalization Service).  González, who had worked at the Laredo, Texas port of entry for eight years and was on duty on January 11, 2001, recounted the agency's routine deportation procedures.  When a JPATS plane arrives, the prisoners -- who number 50 to 120 per day -- are individually released from leg irons, handcuffs, and belly chains and are boarded into government

buses or vans under the supervision of United States Marshals and Immigration and Customs officers. The prisoners are then transported to a secure area with barriers on all sides, placed into groups of five, and visually observed as they cross the border on foot. Afterward, the officers complete individual I-205 forms, which record the name of the transporting officer, the means of arrival, the port, date, and manner of removal, the alien's photograph and right index fingerprint, and the signature of the officer who witnessed the alien's departure. González testified that she had signed Meléndez's I-205 form on January 11, 2001, and that although she could not remember specific events of that day, she "would not sign a form if [she] was not sure that person did exit the United States." Tr. 76.

On June 30, 2004, Meléndez was found guilty and sentenced to 70 months' imprisonment[1] and three years' supervised release. In so holding, the court rejected Meléndez's argument that he never left the United States, because although no witness testified to actually seeing him leave the country, "the practice of signing [the relevant paperwork] after seeing all of the people [who are being deported] go across without specifically looking for one is

---

[1] The court calculated Meléndez's total adjusted offense level to be 24 -- with a base offense level of 8 for violation of 8 U.S.C. § 1326(a), see U.S.S.G. § 2L1.2(a), plus 16 levels for a prior deportation after a criminal conviction on an aggravated felony, see U.S.S.G. § 2L1.2(b)(1)(A). Combined with Meléndez's Criminal History Category of III, the applicable Guideline range was 63 to 78 months.

-4-

sufficient to document that they saw this individual being deported across the border." Tr. 91. The court also denied Meléndez's motion for a downward departure based on "cultural assimilation," stating that Meléndez's case is "not extraordinary," that Meléndez's "assimilation . . . in the criminal justice system perhaps weighs against this request," and that cultural assimilation is similar to "family ties responsibility," which is a discouraged factor. S. Tr. 11-12. Finally, the court rejected Meléndez's argument that the absence of a "Fast Track" program in the District of Maine forms a "basis for a downward departure[,] constitutional or otherwise." Id. This appeal follows.

## II

### A. Sufficiency of the Evidence

Meléndez first argues that the evidence presented at trial was insufficient to support a conviction for illegal re-entry after deportation subsequent to an aggravated felony conviction, in violation of 8 U.S.C. § 1326(a)(2)(b)(2) and § 1101(a)(43)(F). We disagree.

We review challenges to the sufficiency of the evidence following bench trials "de novo, evaluating whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Grace, 367 F.3d 29, 34 (1st Cir. 2004) (internal quotation marks and citations

omitted).  Moreover, "we draw all reasonable evidentiary inferences in harmony with the verdict and resolve all issues of credibility in the light most favorable to the government."  Id.  Thus, and we now emphasize, "'[t]he evidence may be entirely circumstantial, and need not exclude every hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence.'"  United States v. Scantleberry-Frank, 158 F.3d 612, 616 (1st Cir. 1998) (quoting United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991)).

In the instant case, the court -- to convict Meléndez of violating 8 U.S.C. § 1326(a)(2) and (b)(2) -- must have necessarily found that the Government proved beyond a reasonable doubt that Meléndez (1) was an alien, (2) whose deportation was subsequent to a conviction for commission of an aggravated felony, and (3) that he entered or attempted to enter or was later found in the United States, (4) without the express consent of the Attorney General for such entry.  Scantleberry-Frank, 158 F.3d at 616  (citing 8 U.S.C. § 1326).

Meléndez's sole sufficiency challenge is directed at the third element: mainly, that the Government offered no conclusive proof that Meléndez actually left the country and was therefore not "deported."  See United States v. Romo-Romo, 246 F.3d 1272, 1274 (9th Cir. 2001) (holding that an alien cannot be said to have been deported and to have re-entered when the alien never left the

-6-

country at all). Specifically, Meléndez argues that González's inability to remember the specific events of January 11, 2001 -- including the day of the week, the weather, her specific duties that day, where she was positioned, and the actual number of deportees, as well as her inability to recognize Meléndez and whether she actually saw him cross the border -- renders insufficient the Government's proof that Meléndez actually left the country. The missing I-294 form also allegedly detracts from the sufficiency of the evidence regarding actual deportation. We disagree.

To the contrary, we find that the evidence adduced at trial amply supports Meléndez's deportation. The routine procedures recounted -- including the significant physical restraints on the deportees, the close monitoring by U.S. Marshals and Immigration and Customs officers, the physical barriers to the port of entry, the close surveillance of deportees as they walk across the border in groups of five,[2] and the Form I-205 checklist indicating that the officer witnessed the deportee cross the border -- could lead a rational trier of fact to conclude, beyond a reasonable doubt, that Meléndez was actually deported. See Grace, 367 F.3d at 34. The absence of direct evidence -- e.g., the lack of testimony of any individual who personally witnessed Meléndez

---

[2]  González testified that the security for ensuring actual deportation is so tight that no alien had tried to escape during her eight years at Laredo.

depart the United States, or of any photograph or videotape showing the same -- is irrelevant. As we have repeatedly emphasized, "circumstantial evidence, if it meets all the other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the [fact finder] deems it should be given." United States v. Gamache, 156 F.3d 1, 8 (1st Cir. 1998). In fact, "[t]he evidence [supporting the conviction] may be entirely circumstantial." Scantleberry-Frank, 158 F.3d at 616.

Meléndez nonetheless urges us to follow the Ninth Circuit's holding in Romo-Romo, 246 F.3d at 1272, which we find inapposite. There, the issue pertained to the propriety of a jury instruction, not the sufficiency of the evidence at a bench trial. Id. at 1274 (district court erroneously instructing the jury that "[a]n alien who is subject to a lawful deportation order . . ., but who never actually enters Mexico because of his own guile or deceit, may be considered to have been deported"). We find no inaccurate or misconceived perception of this element of deportation in the instant case. Moreover, unlike the defendant in Romo-Romo, Meléndez presents no evidence that he actually escaped from the port of entry, but merely urges the court to speculate about such an escape. Id. at 1274. We refuse to do so now.

Meléndez's remaining challenges -- Remsen's inability to find the Form I-294 in Meléndez's "A file," as well as González's

inability to recall seeing Meléndez actually cross the border --
also falter because these are credibility issues for the fact-
finder to resolve; we will not second-guess them on appeal. See
Grace, 367 F.3d at 34.

For the reasons stated, we reject Meléndez's challenge to
the sufficiency of the evidence for his conviction.

## B.  **Sentencing**

Meléndez further argues that the district court erred in
refusing to depart downward from the Sentencing Guidelines based on
his cultural assimilation into American society, and that the
sentence imposed under the now-advisory Guidelines should be
vacated in light of the Supreme Court's intervening decision in
United States v. Booker, 125 S. Ct. 738 (2005).  These arguments
also fail.

It has long been established that "a sentencing court's
discretionary refusal to depart is [generally] unreviewable."
United States v. Sánchez, 354 F.3d 70, 76 (1st Cir. 2004); see also
United States v. Woodward, 277 F.3d 87, 92-93 (1st Cir. 2002);
United States v. Teeter, 257 F.3d 14, 30 (1st Cir. 2001); United
States v. Morrison, 46 F.3d 127, 130 (1st Cir. 1995); United States
v. Pierro, 32 F.3d 611, 619 (1st Cir. 1994).  Narrow exceptions do
exist, such as when the sentencing court "bases its decision on a
view that it lacks the legal authority to consider a departure,"
United States v. Mejía, 309 F.3d 67, 69 (1st Cir. 2002), or when

the court "base[s] its decision on an error of law," Woodward, 277 F.3d at 92-93. Thus, "we review de novo a district court's determination of its authority to depart, but lack jurisdiction to review a discretionary decision not to depart from the Sentencing Guidelines." Mejía, 309 F.3d at 70 (emphasis added).

Booker, however, has since made the Sentencing Guidelines advisory, giving district courts substantially more discretion in sentencing above or below the Guideline range. Booker, 125 S. Ct. at 767. Although Booker excised the statutory provision of the Sentencing Reform Act that provides the standard of review for sentences on appeal, 18 U.S.C. § 3742(e), it left intact the provision pertaining to appellate review of sentences, 18 U.S.C. § 3742(a). Id. at 765. Pursuant to § 3742(a), this Court therefore continues to possess the same jurisdiction to review Guidelines sentences as before Booker, and accordingly, also still lacks jurisdiction to review a sentencing court's refusal to depart downward based on its belief that the defendant's circumstances fail to warrant such departure. See United States v. Kornegay, 410 F.3d 89, 98 (1st Cir. 2005) (holding that if "the defendant's claim is only that the district court unreasonably declined to exercise its discretion to grant a departure, we may not review it"); see also United States v. Monteiro, --- F.3d ---, 2005 WL 1869918 at *11 (1st Cir. Aug. 9, 2005) (declining to review a sentencing judge's refusal to grant a downward departure where the judge did

not evince an understanding that he was constrained from doing so). Here, given that the sentencing judge believed that he had "discretion for downward departure on th[e] [cultural assimilation] basis," but chose not to do so given the defendant's circumstances, we find ourselves without jurisdiction to review that refusal.[3]

We still review, however, whether a Booker error has occurred. "The Booker error is that the defendant's Guidelines sentence was imposed under a mandatory system." United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005). In reviewing such error, we examine whether the error was preserved below; for example, "whether the defendant below argued that a guideline application transgressed either Apprendi v. New Jersey, 530 U.S. 466 (2000), or Blakely v. Washington, 542 U.S. 296 (2004)." United States v. Martins, --- F.3d ---, 2005 WL 1502939 at *11 (1st Cir. June 27, 2005). Here, given that Meléndez argued, and the Government agreed, to reduce Meléndez's criminal history category

---

[3] We nonetheless note the difficulty of Meléndez's position, who, at the time of sentencing, had lived in the United States for 52 years, has a wife and four children in the United States, and can neither speak nor write Spanish. We recognize that the Ninth Circuit allows "cultural assimilation [as] a proper basis for granting a downward departure in 8 U.S.C. § 1326 cases for persons brought to the United States as children, who had adapted to American culture in a strong way and who, after deportation, returned to the United States for cultural rather than economic reasons." United States v. Rivas-González, 384 F.3d 1034, 1044 (9th Cir. 2004) (citing United States v. Lipman, 133 F.3d 726 (9th Cir. 1998)). Nonetheless, given our lack of jurisdiction, we need not address this issue at the current juncture.

because of <u>Blakely</u>, we will assume that the <u>Booker</u> error is preserved.

In preserved error cases, "the government has the burden of proving beyond a reasonable doubt that the error did not affect the defendant's substantial rights." <u>United States</u> v. <u>Vázquez-Rivera</u>, 407 F.3d 476, 489 (1st Cir. 2005) (internal citations omitted). Under this "extremely difficult, but not impossible, standard," <u>id.</u> at 489-90, "we must be convinced that a lower sentence would not have been imposed had the Guidelines been advisory," <u>id.</u> at 489.

In the instant case, the judge twice denied Meléndez's requests for downward departures -- despite finding that he had discretion to do so -- given "the assimilation that this defendant has had over in the criminal justice system."[4] The judge chided Meléndez for "the lack of respect you have for the United States laws as reflected both in your criminal record and your actions in this case." The judge further stated that "[v]ery clearly you knew

_____

[4] Meléndez's Presentence Investigation Report (PSI) indicates: (1) 3 points for a 1998 Indiana conviction for possession of a schedule II substance that produced a ten-year sentence that was subsequently reduced to six years with four years suspension and two years probation; and (2) 3 points for a 1997 Florida conviction for homicide/manslaughter that produced a ten-year sentence. No points were assigned to two convictions for auto theft, a 1977 drug and weapons offense, a 1977 conviction for possession of a stolen vehicle, a 1982 conviction for bail jumping, or a conviction for unlawful acquisition of a firearm. There are also charges with unknown dispositions, including a 1970 aggravated assault, a 1970 unlawful use of a weapon, a 1976 possession of a controlled substance, and a 1977 theft and possession of heroin.

that you were deported and you figured if you came back and were captured you would serve a light sentence, the worse that happens is they would send you back again as many people have gone through." Thus, although the judge said that "I am not . . . going to sentence you to the high end of the guideline range, that is reserved for people worse than you," he also chose not to sentence Meléndez at the lower range, despite his discretion to do so. See United States v. McLean, 409 F.3d 492, 505 (1st Cir. 2005) (denying Booker remand and noting that since defendant "was sentenced in the middle of the guideline range, rather than at the bottom, and so the district court could have given him a lower sentence under the old regime . . . speaks volumes"). Given that we are "convinced that a lower sentence would not have been imposed had the Guidelines been advisory," Vázquez-Rivera, 407 F.3d at 489, we find no Booker error.

## C. **Fast Track Program**

Finally, Meléndez argues that the absence of a "fast track" program in the district of Maine violated his equal protection rights. We are not convinced.

Fast track programs -- which were initially established in federal district courts along the southwestern United States to accommodate the large number of immigration cases -- offer defendants a sentence reduction, in the form of a downward departure or some other benefit, in exchange for the defendant's

waiver of certain procedural rights. See generally Erin T. Middleton, Fast-Track to Disparity: How Federal Sentencing Policies Along the Southwest Border are Undermining the Sentencing Guidelines and Violating Equal Protection, 2004 Utah L. Rev. 827. Section 5K3.1 of the Guidelines provides: "Upon motion of the Government, the court may depart downward not more than 4 levels pursuant to an early disposition program authorized by the Attorney General of the United States and the United States Attorney for the district in which the court resides." U.S. Sentencing Guidelines Manual § 5K3.1 (2004) (emphasis added); see also Pub. L. 108-21 § 401(m)(2)(B), 117 Stat. 650 (2003). These programs -- promulgated by the Sentencing Commission pursuant to the 2003 PROTECT Act, Pub. L. No. 108-21, 117 Stat. 650 (2003) -- require, at a minimum, that the defendant agree to the factual basis and waive the rights to file pretrial motions, to appeal, and to seek collateral relief (except for ineffective assistance of counsel). Memorandum from Attorney General John Ashcroft, "Department Principles for Implementing an Expedited Disposition or Fast-Track Prosecution Program in a District" (July 28, 2003). Moreover, these programs are authorized only when they are clearly warranted by local conditions within a particular district. Memorandum from Attorney General John Ashcroft to All Federal Prosecutors, "Department Policy Concerning Charging and Prosecuting of Criminal Offenses" (Sep. 23, 2003).

In the instant case, Meléndez argues that the absence of a fast track program in Maine violated his equal protection rights because similarly situated defendants in fast track jurisdictions could avail themselves of a four-level downward departure. However, given the absence of a suspect classification or the implication of fundamental rights, along with the existence of a rational basis underlying the program, we disagree.

"It is well established that a challenged classification that does not involve a suspect class or impinge upon fundamental rights is accorded a strong presumption of validity." Almon v. Reno, 192 F.3d 28, 31 (1st Cir. 1999) (citing Heller v. Doe, 509 U.S. 312, 319 (1993)). Meléndez cites no case law holding that the distinction between aliens sentenced in fast-track versus non-fast-track jurisdictions constitutes a suspect classification, nor does he offer support that the resulting inequity involves fundamental rights. Thus, "[s]uch a classification must be upheld if it is rationally related to a legitimate governmental purpose." Id. (citing Heller, 509 U.S. at 320).

Here, the U.S. Attorney General and the U.S. Attorney for the District of Maine are in the best position to evaluate whether the local conditions in Maine warrant such a program. They could very well find that the low volume of crimes involving illegal aliens in Maine, as compared to southwestern states, enable them to put their resources to better use. For example, they may find that

-15-

the absence of the program could permit swifter adjudication with corresponding benefits to aliens, or that it could achieve greater deterrence through harsher sentences.  We find that these proffered reasons constitute a "reasonably conceivable set of facts that could provide a rational basis for the classification," id. (citing Heller, 509 U.S. at 320), and as such, no equal protection violation exists.[5]

### III

For the reasons stated, the defendant's sentence and conviction are **affirmed**.

---

[5]  We also note that at least three circuits have held that "where [sentencing] disparities arise from varying charging and plea-bargaining policies of the individual United States Attorneys," it is inappropriate for a judge to grant a downward departure.  United States v. Armenta-Castro, 227 F.3d 1255, 1257 (10th Cir. 2000).  See also United States v. Banuelos-Rodríguez, 215 F.3d 969, 978 (9th Cir. 2000) (en banc ); United States v. Bonnet-Grullón, 212 F.3d 692, 710 (2d Cir. 2000).  In any event, we could find no Constitutional mandate that all U.S. Attorneys institute fast track programs and offer them to all defendants, particularly since Meléndez does not allege that the Government had an impermissible motive in deciding not to implement the program. Cf. Wade v. United States, 504 U.S. 181 (1992) (holding that a prosecutor has discretion to make a downward departure motion under U.S.S.G. § 5K1.1, and that the prosecutor's decision not to file a motion is reviewable only if defendant "makes a substantial threshold showing of improper motive").