# United States Court of Appeals
## For the First Circuit

No. 04-2681

UNITED STATES OF AMERICA,

Appellee,

v.

DENNIS JOEL MARTINEZ-FLORES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul Barbadoro, U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell and Cyr, Senior Circuit Judges.

Douglas J. Beaton on brief for appellant.
Mark S. Zuckerman, Assistant United States Attorney, and
Thomas P. Colantuono, United States Attorney, on brief for
appellee.

October 28, 2005

**LYNCH**, **Circuit Judge**. This appeal, from a criminal sentence imposed on an alien who illegally reentered the United States, requires that we address a question of first impression: does the congressional endorsement of downward sentencing departures in conjunction with "fast-track" case processing violate the nondelegation doctrine? We answer the question in the negative; separately, we reject the defendant's request for a Booker remand on grounds of disparity in sentencing between defendants in fast-track jurisdictions and others. We affirm the sentence imposed by the district court.

## I.

The facts are not in dispute. Dennis Joel Martinez-Flores was convicted of the sale and transportation of cocaine in a California state court in 1994 and was deported to Honduras in 1996. He re-entered the United States illegally and was deported again in 1997, this time to Mexico.

In March 2004, Martinez-Flores was arrested again, this time in New London, New Hampshire, and charged with re-entry after deportation in violation of 8 U.S.C. § 1326(a). After his motion to suppress evidence was denied as moot, he pled guilty on August 30, 2004. Martinez-Flores faced 41 to 51 months in prison unless he qualified for a downward departure under the then-mandatory Sentencing Guidelines.

Martinez-Flores made three arguments in support of downward departure. The first two revolved around the authority of the Attorney General to authorize in certain jurisdictions "fast-track" procedures to speed criminal immigration cases through the system, and the concomitant congressional authorization of (and instruction to the Sentencing Commission to provide for) downward departures to defendants in such fast-track programs in exchange for their waiver of procedural rights.

Fast-track programs have been adopted by individual United States Attorneys and authorized by the Attorney General in some federal jurisdictions but not all, and not in New Hampshire. Seizing on this fact, Martinez-Flores first argued that he faced a longer sentence than similarly situated defendants elsewhere in the country. This disparity, he argued, had not been adequately taken into consideration in formulating the Sentencing Guidelines, and thus the district court could rely on it to depart downward. Second, Martinez-Flores argued that Congress violated the nondelegation doctrine by conferring too much discretion on the Attorney General to decide when and where to implement fast-track procedures. Finally, he argued that he should receive an additional downward departure pursuant to U.S. Sentencing Guidelines Manual (U.S.S.G.) § 5K2.0 (permitting departure for mitigating circumstances not taken into account in the Guidelines): he stated that his home in Honduras had been destroyed in a

hurricane and that he had been working as a laborer in New Hampshire to support his wife and children.

The district court rejected Martinez-Flores' fast-track arguments, but it granted his request for a § 5K2.0 departure. It sentenced him on November 29, 2004 to a below-Guidelines term of 24 months' imprisonment, to be followed by three years of supervised release. Martinez-Flores timely appealed, challenging the rejection of his fast-track sentencing claims and asking for a Booker remand.

**II.**

Since both of Martinez-Flores' claims on appeal revolve around fast-track sentencing, we begin with a brief explanation of the procedure and its provenance.

Fast-track sentencing originated not with Congress, but with federal prosecutors in states bordering Mexico. See Middleton, Fast-Track to Disparity: How Federal Sentencing Policies Along the Southwest Border are Undermining the Sentencing Guidelines and Violating Equal Protection, 2004 Utah L. Rev. 827, 831. Faced with a burgeoning load of illegal re-entry and other immigration cases, federal prosecutors in Texas, New Mexico, Arizona, and California adopted policies designed to speed case processing. Id. In the typical fast-track system, defendants who agreed to plead guilty at an early stage, and to waive their rights to file motions and to appeal, were rewarded with shorter

-4-

sentences, either via charge-bargaining or promises of a recommendation for departure at sentencing. Id. at 829-30.

In 2003, Congress endorsed the fast-track concept in a provision of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act ("PROTECT Act"), Pub. L. No. 108-21, 117 Stat. 650 (2003) (codified in scattered Sections of 18, 28, and 42 U.S.C.). The applicable provision, § 401(m)(2)(B) ("the PROTECT Act provision"), instructed the United States Sentencing Commission to "promulgate . . . a policy statement authorizing a downward departure of not more than 4 levels if the Government files a motion for such departure pursuant to an early disposition program authorized by the Attorney General and the United States Attorney." 117 Stat. at 675. Pursuant to this dictate, the Sentencing Commission added a new Guidelines provision, effective October 27, 2003, authorizing the four-level departure. See U.S.S.G. § 5K3.1 (permitting departure and using the same language as the PROTECT Act provision).

Meanwhile, on September 22, 2003, then-Attorney General John Ashcroft issued a memorandum (the "Ashcroft Memorandum") explaining the circumstances under which he would "authorize[]" a fast-track program. The memorandum stated, inter alia, that fast-track programs would receive the Attorney General's authorization where "the district confronts an exceptionally large number of a specific class of offenses within the district" or where "the

district confronts some other exceptional local circumstance with respect to a specific class of cases that justifies expedited disposition." Memorandum from John Ashcroft, Attorney General, to United States Attorneys 2 (Sept. 22, 2003) (setting forth "Department Principles for Implementing an Expedited Disposition or 'Fast-Track' Prosecution Program in a District"), reprinted in 16 Fed. Sent. R. 134 (Dec. 2003).

Where the fast-track programs have been authorized by the Attorney General and implemented, the defendant must "agree to the factual basis [of the criminal charge] and waive the rights to file pretrial motions, to appeal, and to seek collateral relief (except for ineffective assistance of counsel)." United States v. Melendez-Torres, 420 F.3d 45, 52 (1st Cir. 2005) (citing the Ashcroft Memorandum). As of the date of Martinez-Flores' prosecution and sentencing, such programs had been authorized in various districts; New Hampshire was not among them.

### III.

**A.        The Nondelegation Argument**

Martinez-Flores focuses on appeal on his constitutional attack on the fast-track system.[1] He argues that by virtue of the

---

[1]   This court has previously rejected constitutional claims that the fast-track programs violate equal protection, see Melendez-Torres, 420 F.3d at 52-53, while other circuits said as much in dicta prior to the PROTECT Act, see, e.g., United States v. Banuelos-Rodriguez, 215 F.3d 969, 977 (9th Cir. 2000) (en banc) (stating, in the context of a fast-track challenge, that "[a] wide disparity between sentencing schemes of different jurisdictions

PROTECT Act provision, Congress delegated excessive legislative power to the Attorney General to decide when districts may install fast-track systems and when they may not. As support for this argument, Martinez-Flores points us to the Attorney General's criteria for authorizing fast-track programs. He argues that the terms "exceptionally large number" and "exceptional local circumstance" are so vague and subjective that they exacerbate the excessive delegation problem created by the PROTECT Act provision. We disagree. On these facts, we find that no delegation exists at all, and therefore that the constitutional limits on Congress' power to delegate could not have been transgressed.

### 1.    Nondelegation Principles

"The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." Mistretta v. United States, 488 U.S. 361, 371 (1989) (rejecting delegation challenge to the Guidelines system). Because the Constitution states that all federal legislative power "shall be vested in a Congress of the United States," U.S. Const. art. I, § 1, the Supreme Court "long ha[s] insisted that 'the integrity and maintenance of the system of government ordained by the

---

does not violate equal protection, even where two persons who commit the same crime are subject to different sentences" (quoting United States v. Oakes, 11 F.3d 897, 899 (9th Cir. 1993)) (internal quotation marks omitted)). As best we can tell, no circuit court has as yet faced a constitutional challenge to the PROTECT Act provision based on the nondelegation doctrine.

Constitution' mandate that Congress generally cannot delegate its legislative power to another Branch." Mistretta, 488 U.S. at 371-72 (quoting Field v. Clark, 143 U.S. 649, 692 (1892)).  The Court, however, also has recognized that this principle "do[es] not prevent Congress from obtaining the assistance of its coordinate Branches," id. at 372, and that how it may go about obtaining that assistance in a particular case "'must be fixed according to common sense and the inherent necessities of the government co-ordination,'" id. (quoting J. W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 406 (1928)).  The Court developed the following rule: "So long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'"  Id. (quoting J.W. Hampton, 276 U.S. at 409) (alteration in the original).

Two details of the nondelegation jurisprudence are worthy of note.  First, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."  Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 475 (2001).  In other words, if Congress delegates a relatively narrow task, it need not cabin the actor's discretion as to how to accomplish that task, whereas if it delegates a broad duty -- for example, setting national air quality standards -- it

must provide "substantial guidance." <u>Id.</u> Second, the nondelegation principle is extraordinarily difficult to violate. In its entire history, the Supreme Court "ha[s] found the requisite 'intelligible principle' lacking in only two statutes"; both of those decisions date to 1935. <u>Id.</u> at 474 (citing <u>Panama Refining Co.</u> v. <u>Ryan</u>, 293 U.S. 388 (1935); <u>A.L.A. Schechter Poultry Corp.</u> v. <u>United States</u>, 295 U.S. 495 (1935)); <u>see</u> Sunstein, <u>Nondelegation Canons</u>, 67 U. Chi. L. Rev. 315, 322 (2000) (describing the nondelegation doctrine as having had "one good year, and 211 bad ones (and counting)").

## 2. Analysis

Turning to the facts before us, we begin by noting that the Attorney General's memorandum, with its "exceptionally large number" and "exceptional local circumstance" wording, is irrelevant to the nondelegation question. As the Supreme Court made clear in <u>Whitman</u>, the proper focus of nondelegation analysis is on the terms of Congress' delegation to the agency or other governmental body, not on the terms of the agency's subsequent exercise of the delegated authority.[2]  531 U.S. at 472-73.

---

[2]  Therefore, an agency cannot "cure an unconstitutionally standardless delegation of power by declining to exercise some of that power." <u>Whitman</u>, 531 U.S. at 473. Conversely, a congressional assignment of power not by its terms violative of the nondelegation doctrine cannot become so because of the breadth with which the agency exercises it. If it is the agency, and not Congress, whose exercise of authority is too broad, the relevant objection would not be that Congress' delegation was unconstitutional, but that the agency had exceeded its statutory

-9-

We turn, then, to the words and context of the PROTECT Act provision. The provision accomplishes two things. First, it issues a mandate to another governmental actor: it instructs the Sentencing Commission to "promulgate . . . a policy statement authorizing a downward departure of not more than 4 levels." § 401(m)(2)(B), 117 Stat. at 675. Second, it sets a condition on that mandate: it states that the four-level departure will be authorized under the Guidelines in a given jurisdiction only if the jurisdiction's fast-track program has been "authorized by the Attorney General and the United States Attorney." Id.

It is clear that the first of these two items, the mandate to the Sentencing Commission, does not create a nondelegation problem. Congress created the Sentencing Commission and may constitutionally require the Commission to set sentencing policy. Mistretta, 488 U.S. at 412 ("We conclude that in creating the Sentencing Commission . . . Congress neither delegated excessive legislative power nor upset the constitutionally mandated balance of powers among the coordinate Branches."); see also United States v. LaGuardia, 902 F.2d 1010, 1013-16 (1st Cir. 1990) (rejecting a claim that the Sentencing Guidelines' restrictions on judicial sentencing discretion violate the Due Process Clause). Moreover, the PROTECT Act's mandate to the Commission is narrow and highly specific: it tells the Commission what to write and how to

authority.

write it.  It therefore involves no "agency discretion," and the "scope of the power . . . conferred" is minuscule.  See Whitman, 531 U.S. at 475.  If authorizing the Commission "to determine the relative severity" of all federal crimes does not constitute excessive delegation, see Mistretta, 488 U.S. at 377, neither does the narrow mandate at issue here.

Any nondelegation challenge therefore must rest on the condition -- approval by the Attorney General of the fast-track program involved -- that Congress (and the Commission) placed on the downward departure.  The argument must be that that condition created an implied delegation of congressional power to the Attorney General to decide when fast-track programs are permissible and when they are not.

But the PROTECT Act provision does not purport to delegate responsibility to, or otherwise regulate, the Executive Branch's prosecutorial arm.  Instead, it simply exercises Congress' power to regulate certain aspects of federal sentencing; it does so by issuing (through the agency of the Sentencing Commission) a new sentencing policy.  The fact that the new sentencing policy contains a condition that depends for its fulfillment on actions of the Attorney General does not mean Congress has delegated either Legislative or Judicial Branch power to the Attorney General.  Other aspects of sentencing also require as a condition the action of a prosecutor.  For example, judges are authorized to grant

downward departures to defendants who provide "substantial assistance in the investigation or prosecution of another person" -- but only "[u]pon motion of the government" declaring that the defendant has done so.  USSG § 5K1.1.

Under the terms of the PROTECT Act provision, in fact, the Attorney General was not obligated to do anything at all; he could have taken absolutely no action with regard to fast-track programs, leaving their existence and their configuration to the continued discretion of individual United States Attorneys.  It is true that if the Attorney General had not taken any action, the PROTECT Act provision would not have authorized downward departure on the basis of a defendant's fast-track cooperation.  But that effect would have sprung from Congress' control over sentencing, not over federal prosecutors, and prosecutors still would have been free to achieve the same outcomes via the bargaining process.  In such a situation, we cannot say that Congress delegated legislative or judicial power to the Attorney General.  Further, even assuming arguendo that the nondelegation doctrine did somehow apply, we could not say that any delegation was insufficiently cabined or that it would violate the "intelligible principle" rule.  Any authority delegated here "is no broader than the authority [prosecutors] routinely exercise in enforcing the criminal laws." United States v. Batchelder, 442 U.S. 114, 126 (1979).  Where that is the case, the nondelegation principle is not violated.  Id.

**B.**        **The "Unwarranted Disparities" Argument**

Martinez-Flores also argues that the existence of fast-track sentencing in some jurisdictions but not others creates unwarranted sentencing disparities. He argues that these disparities justify downward departure and that the district court might have so held if sentencing had occurred after the Supreme Court's decision in United States v. Booker, ___ U.S. ___, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005); he therefore requests a Booker remand.

Martinez-Flores presented a somewhat different version of this argument at sentencing. At that time, he was faced with a system of mandatory Sentencing Guidelines and a statutory provision -- 18 U.S.C. § 3553(b) -- that permitted downward deviation from the Guidelines only in the face of a "mitigating circumstance" that was "not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." Id. § 3553(b)(1). Martinez-Flores argued that the sentencing disparities created by the unequal distribution of fast-track programs constituted such a mitigating circumstance. The district court rejected this argument. At least three circuit courts had earlier reached similar results, holding that fast-track disparities did not under the Guidelines justify downward departure. See United States v. Banuelos-Rodriguez, 215 F.3d 969, 973 (9th Cir. 2000) (en banc) ("We fail to see how the decision of [federal prosecutors in

-13-

another district to adopt fast-track procedures] . . . can be a 'mitigating circumstance' with regard to Defendant or his crime."); United States v. Armenta-Castro, 227 F.3d 1255, 1257 (10th Cir. 2000) (same); United States v. Bonnet-Grullon, 212 F.3d 692, 705-06 (2d Cir. 2000) (rejecting possibility of downward departure to offset disparities created by the Southern District of California's charge-bargaining fast-track system).

The question is different post-Booker. The Supreme Court's holding in that case excised § 3553(b)(1) from the statutory scheme and rendered the Guidelines non-mandatory. Booker, 125 S.Ct. at 764-67. As a result, § 3553(a), which contains a list of factors to be considered by federal judges in imposing sentences, has taken on renewed importance. Recognizing this, Martinez-Flores shifts his argument on appeal to focus on § 3553(a)(6), which instructs the district judge to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" when imposing sentence. Martinez-Flores argues that the district judge at his sentencing felt constrained by the then-mandatory Guidelines and so did not have the opportunity to fully consider whether fast-track sentencing created "unwarranted sentence disparities" under § 3553(a)(6). He thus requests a Booker remand.

Martinez-Flores did not preserve a Booker issue, so our review is for plain error. See United States v. Antonakopoulos,

399 F.3d 68, 76 (1st Cir. 2005).  For Martinez-Flores' claim to survive plain error review, we must find "a reasonable probability that the district court would impose a different sentence more favorable to the defendant under the new 'advisory Guidelines' Booker regime."  Id. at 75.  "It is not enough for a defendant to show that he was not given the benefit of a sentence fashioned under advisory guidelines; rather, he must offer some reasonable indication that the sentencing court, freed of the shackles forged by mandatory guidelines, would have fashioned a more favorable sentence."  United States v. Guzman, 419 F.3d 27, 32 (1st Cir. 2005).  In other words, the defendant "must point to specific indicia" that the requisite reasonable probability exists.  United States v. Sanchez-Berrios, No. 03-2333, 2005 U.S. App. LEXIS 20110, at *29 (1st Cir. Sept. 20, 2005).

Martinez-Flores points to no "specific indicia" that the district court would have felt differently had it been operating under advisory Guidelines.  In fact, the record suggests just the opposite.  The district court stated during the sentencing hearing that it was "not free to simply give every other defendant who comes before me the benefit of the [fast-track] program that might have some pragmatic justification in particular districts but is not justified here."  (emphasis added).  This comment suggests that the district court would not have considered any fast-track disparities "unwarranted" even in an advisory Guidelines universe.

-15-

Martinez-Flores therefore cannot meet the <u>Antonakopoulos</u> plain-error standard.[3]

The judgment is **<u>affirmed</u>**.

---

[3]  It is arguable that even post-<u>Booker</u>, it would never be reasonable to depart downward based on disparities between fast-track and non-fast-track jurisdictions given Congress' clear (if implied) statement in the PROTECT Act provision that such disparities are acceptable. <u>See</u> <u>United States</u> v. <u>Perez-Chavez</u>, No. 2:05-CR-00003PGC, 2005 U.S. Dist. LEXIS 9252, at *18-*23 (C.D. Utah May 16, 2005) (holding, in light of the PROTECT Act provision, that "Congress has concluded that the advantages stemming from fast-track programs outweigh their disadvantages, and that any disparity that results from fast-track programs is not 'unwarranted'").  Because we resolve the question in this case on <u>Booker</u> plain-error grounds, we need not reach that or any other issue of reasonableness.