PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ALFREDO MORALES-CHAIRES
a/k/a Alfredo Morales-Chairez a/k/a
Alfredo F. Morales a/k/a Alfredo
Morales a/k/a Alfredo Frank Morales,

Defendant - Appellant.

No. 05-1190

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 04-CR-475-B)**

---

Submitted on the briefs: *

Raymond P. Moore, Federal Public Defender, Edward R. Harris, Assistant Federal
Public Defender, John T. Carlson, Research and Writing Attorney, Denver,
Colorado, for Defendant - Appellant.

William J. Leone, United States Attorney, Jerry N. Jones, Assistant United States
Attorney, Denver, Colorado, for Plaintiff - Appellee.

---

*After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination
of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument.

Before **TACHA,** Chief Circuit Judge, **ANDERSON** and **BALDOCK** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

Alfredo Morales-Chaires pled guilty to one count of unlawful reentry by a previously deported alien previously convicted of an aggravated felony, in violation of 8 U.S.C. § 1326(a), (b)(2). He was sentenced to seventy-seven months' imprisonment. He appeals that sentence. For the reasons stated below, we affirm.

## BACKGROUND

Morales-Chaires was born in Mexico in 1974 and is a Mexican citizen. He first entered the United States in 1981. In 1995, he was convicted in a Colorado state court of two counts of possession of cocaine, each a felony, in violation of Colo. Rev. Stat. § 18-18-405. He was sentenced to four years' imprisonment for each count. Morales-Chaires was accordingly deported to Mexico in July 1997.

He illegally reentered the United States in August 1998. In September 1998, he was again convicted in a Colorado state court of one count of possession of cocaine, a felony, again in violation of Colo. Rev. Stat. § 18-18-405, and was sentenced to two years' imprisonment. Morales-Chaires was again deported to

Mexico in March 2000. In April 2000, he again illegally reentered the United States. He was apprehended and deported for the third time in December 2002.

Morales-Chaires illegally reentered the United States yet again, in January 2003. On October 24, 2003, Morales-Chaires was convicted in a Colorado state court of one count of possession of cocaine, a felony, in violation of Colo. Rev. Stat. § 18-18-405, and was sentenced to eighteen months' imprisonment. He was incarcerated until October 21, 2004, at which time he was transferred to the custody of the United States Immigration and Customs Enforcement ("ICE"). He voluntarily admitted to the instant offense of illegally reentering the United States in January 2003, after having been previously deported.

On November 17, 2004, a grand jury returned an indictment against Morales-Chaires, charging him with one count of unlawful reentry by a deported alien whose removal was subsequent to the commission of an aggravated felony, in violation of 8 U.S.C. § 1326(a), (b)(2). Morales-Chaires and the government entered into a written plea agreement, pursuant to which Morales-Chaires pled guilty and the government agreed to request a three-level decrease in Morales-Chaires' United States Sentencing Commission, Guidelines Manual ("USSG") offense level, and to recommend a sentence at the bottom of the applicable Guideline range. The plea agreement included a tentative calculation of the total adjusted Guideline offense level of 21, a criminal history category of VI, and the

resultant advisory Guideline range of seventy-seven to ninety-six months' imprisonment.

The Presentence Report ("PSR") agreed with the plea agreement's calculations of offense level, criminal history and Guideline range. The PSR noted Morales-Chaires' extensive criminal history involving multiple prior convictions, including numerous felonies, starting when Morales-Chaires was fourteen years old and continuing through 2003. The PSR further noted that "[t]he severity of sanctions imposed for past criminal behavior has gradually increased over the years, however, it does not appear it has influenced defendant's conduct." PSR at ¶ 144, R. Vol. III.

Morales-Chaires filed a "Memorandum Pursuant to 18 U.S.C. § 3553(a) and Motion for Downward Departure from Advisory Guidelines" urging the court to "depart downward from the sentencing guideline range otherwise applicable" because:

> the offense conduct represents a significantly lower risk of harm and lower level of moral culpability than the typical case of this type and the punishment otherwise prescribed by the sentencing guidelines does not reflect the seriousness of the offense conduct; and . . . a departure serves critical goals of the sentencing guidelines.

Mem. at 2, R. Vol. I, tab 23. He argued that he had been "a productive and contributing member of society" and that his "primary source of trouble with the law has been drug-related." Id. at 6. He also argued that a downward departure

-4-

would serve the goals of the sentencing guidelines because it would avoid his receiving different treatment from others similarly situated because, as an alien, he would have less access to programs in prison than non-aliens. Furthermore, he argued that the sentencing factors specified in 18 U.S.C. § 3553(a) support a sentence below the otherwise applicable Guideline range, in particular because, as discussed further below, of the disparities between sentences imposed in districts where a "fast-track" program exists for aliens accused of illegal reentry and in districts, like Colorado, where no such "fast-track" program exists.

At his sentencing proceeding on April 8, 2005, the district court denied Morales-Chaires' request for a downward departure under the Guidelines, and it rejected his argument that the sentencing factors contained in § 3553(a) compelled a sentence different than what the Guidelines recommended, including his argument based upon fast-track programs in other districts. The district court went through each of the statutory sentencing factors and concluded that they supported the recommended Guideline sentence. It also rejected his argument based upon the lack of a fast-track program in Colorado, finding that "for the Court to depart on this basis is in essence a violation of the doctrine of separation of powers because of interference with a prosecutor's exercise of discretion in charging and plea bargaining. That is the province of the executive branch." Tr. of Sentencing at 18, R. Vol. II. The court therefore sentenced Morales-Chaires to

seventy-seven months' imprisonment, declaring that advisory Guideline sentence

to be "reasoned and reasonable." Id. at 19.

Morales-Chaires appeals his sentence, arguing the court erred in sentencing

him to a longer sentence than he would have received had he been prosecuted in a

fast-track jurisdiction.

**DISCUSSION**

Fast-track sentencing programs originated with federal prosecutors in states

bordering Mexico, who were faced with increasing numbers of illegal reentry and

other immigration cases. They accordingly designed programs whereby

defendants accused of certain immigration offenses would plead guilty early in

the process and waive their rights to file certain motions and to appeal, in

exchange for a shorter sentence. The shorter sentence was accomplished either by

charge-bargaining or by promising to recommend a downward departure at

sentencing. See generally United States v. Martinez-Flores, No. 04-2681, 2005

WL 2877779 (1st Cir. Oct. 28, 2005); United States v. Perez-Chavez, No. 2:05-

CR-00003PGC, 2005 U.S. Dist. LEXIS 9252 (D. Utah May 16, 2005); Erin T.

Middleton, Note, Fast-Track to Disparity: How Federal Sentencing Policies

Along the Southwest Border Are Undermining the Sentencing Guidelines and

Violating Equal Protection, 2004 Utah L. Rev. 827.

"In 2003, Congress endorsed the fast-track concept in a provision of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act ("PROTECT Act"), Pub. L. No. 108-21, 117 Stat. 650 (2003) (codified in scattered Sections of 18, 28, and 42 U.S.C.)." Martines-Flores, 2005 WL 2877779, at *__. A provision of the PROTECT Act directed the United States Sentencing Commission to "promulgate . . . a policy statement authorizing a downward departure of not more than 4 levels if the Government files a motion for such departure pursuant to an early disposition program authorized by the Attorney General and the United States Attorney." Pub. L. No. 108-21, § 401(m), 117 Stat. at 675. The Sentencing Commission accordingly added a new Guidelines section, effective October 27, 2003, authorizing such four-level departures. See USSG §5K3.1, p.s.

In jurisdictions where fast-track programs have been authorized by the Attorney General, defendants must "agree to the factual basis [of the criminal charge] and waive the rights to file pretrial motions, to appeal, and to seek collateral relief (except for ineffective assistance of counsel)." United States v. Melendez-Torres, 420 F.3d 45, 52 (1st Cir. 2005). At the time Morales-Chaires pled guilty and was sentenced, fast-track programs were in effect in a number of

jurisdictions, but not in Colorado. [1] Morales-Chaires argues that he could have received a sentence as low as thirty months were he to have been apprehended in one of the districts where the fast-track program is available.

During the time period when the Sentencing Guidelines were viewed and applied as mandatory, several circuits, including our own, held that "the existence of sentencing disparities as to illegal reentry cases among the various federal districts, where such disparities arise from varying charging and plea-bargaining policies of the individual United States Attorneys, [does not] provide an appropriate basis for a downward departure at sentencing[.]" United States v. Armenta-Castro, 227 F.3d 1255, 1257 (10th Cir. 2000); see also United States v. Banuelos-Rodriguez, 215 F.3d 969, 972-78 (9th Cir. 2000) (en banc) (same); United States v. Bonnet-Grullon, 212 F.3d 692, 697-710 (2d Cir. 2000) (same). In particular, we held that "the Sentencing Guidelines categorically proscribe the consideration of sentencing disparities flowing from the exercise of prosecutorial discretion in charging and plea bargaining practices." Armenta-Castro, 227 F.3d at 1258.

The Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), however, rendered the Guidelines advisory, not mandatory. "As a result

---

[1]Among the districts with fast-track programs are the districts of Texas, California, Arizona, New Mexico, Idaho, Nebraska, North Dakota, the Northern District of Georgia, and the Western District of Washington.

of this change in the law governing sentencing, the pre-Booker decisions . . . that rejected departures from the then-mandatory Guideline range on the ground the Guidelines precluded such departures certainly cannot be ignored, but they can no longer be considered controlling law." United States v. Medrano-Duran, 386 F. Supp. 2d 943, 945 (N.D. Ill. 2005); see also Martinez-Flores, 2005 WL 2877779, at * __ (noting that "[t]he question is different post-Booker"). Under Booker, when sentencing defendants, courts must refer to the list of factors contained in 18 U.S.C. § 3553(a), including (a)(6) which provides that courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). [2] Morales-Chaires focuses on that provision, arguing that the district

_____

[2]18 U.S.C. § 3553(a) provides in pertinent part as follows:

> **(a) Factors to be considered in imposing a sentence.**–The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider–
>
> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
> **(2)** the need for the sentence imposed–
> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> **(B)** to afford adequate deterrence to criminal conduct;
> **(C)** to protect the public from further

(continued...)

-9-

court's failure to sentence him below the suggested Guideline range amounted to permitting an "unwarranted sentence disparit[y]" between himself and other illegal reentrants "with similar records who have been found guilty of similar conduct," and who are able to take advantage of a fast-track program.

"We retain 'the same jurisdiction to review guidelines sentences as [we] had before the Supreme Court's decision in Booker.'" United States v. Serrata, 425 F.3d 886, 906 (10th Cir. 2005) (quoting United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)). We now review sentences imposed after Booker for reasonableness. See Booker, 125 S. Ct. at 766 (noting that the § 3553(a) factors "will guide appellate courts . . . in determining whether a sentence is unreasonable"); Serrata, 425 F.3d at 911. Accordingly, we examine whether Morales-Chaires' seventy-seven month sentence was reasonable.

---

[2](...continued)
crimes of the defendant; and
**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
**(3)** the kinds of sentences available;
                    . . .
**(5)** any pertinent policy statement issued by the Sentencing Commission . . .;
**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
**(7)** the need to provide restitution to any victims of the offense.

As indicated above, the district court carefully examined all the § 3553(a) factors before deciding on the sentence imposed. It considered the "nature and circumstances of the offense as committed by this defendant." Tr. of Sentencing at 12, R. Vol. II. It concluded that

> the way in which this offense was committed is exacerbated because of a history of committing a drug offense, felony, being deported, illegal reentry, committing a drug offense, being deported, illegal reentry, committing a drug offense, being deported and illegal reentry.
>
> And that is a serious violation of the law compounded by its repetition over this time and compounded by the fact that despite being imprisoned for these drug offenses and despite being deported, that has had no deterrent effect whatsoever on continued violation of the law.

Id. at 13. Considering the need to promote respect for the law, the court stated that an insufficiently severe sentence would undermine respect for the law, in light of the serious criminal history just outlined. With respect to deterrence, the court stated "[f]or the same reasons . . . , a sentence that is too lenient in this case would not deter similar criminal repeated violation[s], but would encourage [them]." Id. at 14. The court then explained why the various reasons Morales-Chaires presented as justifying a more lenient sentence—his desire to spend time with and be the primary support for his ailing 85-year-old father, his claim to be a

productive and contributing member of society, and his cultural assimilation in the United States—were not credible. [3]

The court then turned to Morales-Chaires' argument concerning the difference between sentences in fast-track jurisdictions and jurisdictions without fast-track programs, and held:

> [F]or the Court to depart on this basis is in essence a violation of the doctrine of separation of powers because of interference with a prosecutor's exercise of discretion in charging and plea bargaining. That is the province of the executive branch.
> So if courts were to buy into the idea that where there are fast-track programs, principally in the border states like New Mexico, for a reduction of sentence in order to achieve proportionality of a vast majority of the districts with a small minority of the districts that in essence would require prosecutors to stand this system of justice on its head and require all districts to provide reduction in sentence not taking into account a defendant's status as an aggravated felon for all illegal reentry cases regardless of the particular case or the appropriate exercise of prosecutorial discretion.
> . . . [Morales-Chaires' argument] invites judicial legislation, . . . and I decline to go there for good reason. Not the job of the Court to legislate under our tripartite form of constitutional government. And it undermines the will of Congress.

---

[3]With respect to Morales-Chaires' desire to care for his father, the court asked "why is it that at this point in this defendant's life he is now very concerned about his 85-year-old father?" Tr. of Sentencing at 15, R. Vol. II. Regarding Morales-Chaires' claim to have been a productive and contributing member of society, the court bluntly observed that "when one looks at his employment history and . . . his criminal history, that's just simply not the reality here. He has not been a productive and contributing member of society. . . . [H]e has been a drain on this society, which is contrary to the policy of Congress." Id. at 16. The court then noted that while there "has been some cultural assimilation in this country, . . . it has been in a criminal milieu." Id. at 17.

Id. at 18. The court therefore concluded that the Guideline range of seventy-seven to ninety-six months was "reasoned and reasonable" and sentenced Morales-Chaires to the low end. The court noted that "application of the statutory factors in light of the advice of the Guidelines could call, frankly, for an upward departure. Could well provide a reasoned and reasonable judgment and sentence at the high end of the Guideline range here." Id. at 19.

The only argument Morales-Chaires pursues on appeal is the fast-track argument. This is an issue of first impression, since Booker, in this circuit. The First Circuit has suggested in dicta that it rejects the argument Morales-Chaires makes to us. See Martinez-Flores, 2005 WL 2877779, at *__ n.3 ("It is arguable that even post-Booker, it would never be reasonable to depart downward based on disparities between fast-track and non-fast-track jurisdictions given Congress' clear (if implied) statement in the PROTECT Act provision that such disparities are acceptable. Because we resolve the question in this case on Booker plain-error grounds, we need not reach that or any other issue of reasonableness." (citation omitted)). This issue has divided district courts. Compare United States v. Peralta-Espinoza, 383 F. Supp. 2d 1107, 1108 (E.D. Wis. 2005) (holding "under 18 U.S.C. § 3553(a)(6), courts may reduce sentences to remedy . . . disparity" caused by fast-track programs) and United States v. Ramirez-Ramirez, 365 F. Supp. 2d 728, 732 (E.D. Va. 2005) ("In some cases, under Booker and 18

U.S.C. § 3553(a), it may be appropriate for the Court to exercise its discretion in order to minimize the sentencing disparities that exist in cases involving illegal re-entry.") and United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 963 (E.D. Wis. 2005) (holding "under Booker and § 3553(a)(6), it may be appropriate in some cases for courts to exercise their discretion to minimize the sentencing disparity that fast-track programs create") with Perez-Chavez, 2005 U.S. Dist. LEXIS 9252, at *23 (holding, in light of the PROTECT Act provision, that "Congress has concluded that the advantages stemming from fast-track programs outweigh their disadvantages, and that any disparity that results from fast-track programs is not 'unwarranted'").

Yet another district court examined the two different types of fast-track programs—"those which, consistent with [USSG] §5K3.1 and the Congressional directive, rely on downward departures of up to four levels, and those which rely on charge-bargaining, in other words, where the defendant is permitted to plead guilty to a reduced charge." Medrano-Duran, 386 F. Supp. 2d at 946. The court further observed that "[t]he fast track districts that rely on charge-bargaining use methodologies that permit far greater sentence reductions than contemplated by Congress' directive in the PROTECT Act and the Sentencing Commission's policy statement in § 5K3.1" Id. While the court concluded that sentence disparities resulting from the application of the Sentencing Commission's policy

statement in §5K3.1 were not "unwarranted" under 18 U.S. C. § 3553(a)(6), [4] it determined that sentencing disparities caused by "prosecutorial charging decisions" may be unwarranted.     Medrano-Duran , 386 F. Supp. 2d at 947.  As the court stated, "[t]here is nothing in § 3553,     Booker , or any other existing authority to support a construction of § 3553(a)(6) that allows Congress and prosecutors to determine what sentence disparities are warranted and unwarranted but prevents a court from doing so."    Id.  Accordingly, the court "determined that the disparity between Medrano-Duran and illegal re-entry defendants in districts with early disposition programs was an unwarranted disparity among similarly situated defendants within the meaning of § 3553(a)(6)."    Id. at 948.

By contrast, the court in    Perez-Chavez  held that sentencing disparities caused by the existence of fast-track programs were not unwarranted.  First, it observed that  Armenta-Castro  remained persuasive Tenth Circuit authority for that proposition: "  Armenta-Castro 's holding rested on the fact that the Guidelines *implicitly*  rendered prosecutorial discretion an irrelevant factor for purposes of downward departures.  That reasoning is, of course, much more powerful in the context of the PROTECT Act, which now    *explicitly*  considers the fast-track issue

_____

[4]As the court stated, "[t]he Court seriously questions whether a sentencing disparity among defendants in different districts that results from application of a policy statement adopted by the Sentencing Commission, pursuant to an express Congressional directive, could appropriately be considered 'unwarranted' within the meaning of § 3553(a)(6)." Medrano-Duran, 386 F. Supp. 2d at 946.

-15-

and spells out how such questions are to be handled." Perez-Chavez , 2005 U.S.

Dist. LEXIS 9252, at *19-20 (footnotes omitted). Second, it concluded that

Booker did not cause any meaningful change because "even after Booker the

court must still 'consider' the Guidelines." Id. at *21. "In short, Congress has

concluded that the advantages stemming from fast-track programs outweigh their

disadvantages, and that any disparity that results from fast-track programs is not

'unwarranted.'" Id. at *23.

We conclude that, in this particular case, we need not resolve whether

sentencing disparities caused by the existence of fast-track programs in some

jurisdictions are or are not, or may be in certain circumstances, considered

unwarranted under § 3553(a)(6). Section 3553(a)(6)'s directive to sentencing

courts to avoid "unwarranted sentencing disparities among defendant with similar

records who have been found guilty of similar conduct" is but one of several

factors for a court to consider in determining a reasonable sentence. As indicated,

the court in this case carefully reviewed all the factors listed in § 3553(a),

including § 3553(a)(6), and concluded that they fully supported the sentence

imposed. Even one of the courts which recognized that sentencing disparities

caused by fast-track programs could justify a lower sentence concluded that the

other factors in § 3553(a) may preclude such a result: "I would have imposed a

below-guideline sentence based in part on fast-track disparity if the other

§ 3553(a) factors had not weighed against such a sentence." Peralta-Espinoza, 383 F. Supp. 2d at 1112; cf. Medrano-Duran, 386 F. Supp. 2d at 948-49 (court reduced defendant's advisory Guideline range by three levels, in part because of unwarranted disparity caused by fast track programs but also because other factors—defendant's "youth, the fact that he had no prior illegal re-entry offenses, and the fact that he committed no other crimes following his return to this country"—suggested leniency). We therefore conclude that Morales-Chaires' seventy-seven month sentence is reasonable.

## CONCLUSION

For the foregoing reasons, Morales-Chaires' sentence is AFFIRMED.